NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0759n.06

No. 11-5040

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Jul 13, 2012*
LEONARD GREEN, Clerk

RAYMOND DAVIS, SR.,                           )
                                              )
    **Plaintiff-Appellant,**                    )    ON APPEAL FROM THE
                                              )    UNITED STATES DISTRICT
v.                                            )    COURT FOR THE MIDDLE
                                              )    DISTRICT OF TENNESSEE
CITY OF CLARKSVILLE,                          )
                                              )
    **Defendant-Appellee.**                     )    **O P I N I O N**
                                              )
_____      )

Before:  SILER and MOORE, Circuit Judges; VAN TATENHOVE,[*] District Judge.

**KAREN NELSON MOORE, Circuit Judge.**  When Raymond Davis, a domestic-violence
investigator for the City of Clarksville ("City"), first sued his employer in 2006 for racial
discrimination in the workplace, the City settled the case.  Two years later, Davis was terminated for
allegedly making false statements in an incident report.  Davis again sued the City raising claims of
unlawful employment discrimination and retaliation under federal and state law.  This time the
district court granted summary judgment to the City on all claims, and Davis now appeals.  For the
following reasons, we **AFFIRM**.

## I.  BACKGROUND

Davis, an African American male, worked for the City of Clarksville Police Department from
1993 until his termination in March 2009.  From 2000 until the time of his termination, Davis was

_____

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern
District of Kentucky, sitting by designation.

employed as a domestic-violence investigator. On January 13, 2006, Davis sued the City of Clarksville alleging racial discrimination and a racially hostile work environment. Davis and the City settled in March 2007, and Davis continued his employment with the City. Alonzo Ansley was appointed as the interim Chief of Police on February 1, 2007, and was eventually appointed Chief of Police on September 25, 2007. R. 17-3 (Ansley Aff. at ¶ 2) (Page ID #94).

Davis claims that since he settled his 2006 lawsuit, the racially hostile work environment has continued. Both on appeal and below he provides a litany of racial epithets and derogatory comments overheard within the Clarksville Police Department. Appellant Br. at 5-9; R. 27 (Pl.'s Opp. to Summ. J. at 3-4) (Page ID #591-92). Davis does not dispute, however, that these incidents are the same ones that he identified in his initial lawsuit and that virtually all of them occurred before or during 2006. Since Ansley became Chief, Davis identifies only two instances of offensive remarks at work that he claims went unpunished: a racist text message that circulated in the department and a racially derogatory remark by Mike Parr, a member of the command staff. *See* Appellant Br. at 10-11; R. 27 (Pl.'s Opp. to Summ. J. at 5) (Page ID # 593).[1]

Davis also claims that his work was overly scrutinized on three separate occasions since the settlement: (1) in February 2008 he inquired why officers did not arrest the primary aggressor in a

---

[1]Davis cites solely to Chief Ansley's deposition as support for both of these incidents, but Chief Ansley in his deposition goes on to explain that he did not hear about the text message until much later and never investigated it because it was never reported internally and he had never seen evidence of it. R. 29-1 (Ansley Dep. at 39-42) (Page ID #636-39). Chief Ansley admits that Mike Parr was not disciplined, but explains that the comment was thoroughly investigated and determined to be a misconstrued movie reference not a racial slur. *Id.* at 51-52 (Page ID # 640-41).

domestic-violence report and was told no action would be taken; (2) in July 2008 he waited an extra day to complete an investigation and was accused of not doing his job, and he was questioned regarding why he used an incorrect case number on his report; and (3) in January 2009 he investigated a rape but ultimately determined one had not occurred and was then questioned about his decision. R. 17-1 (Resps. to Interrogs. at 2-3) (Page ID #71-72). He admits, however, that he received no discipline or adverse employment action as a result of any of these incidents, including when he provided an incorrect case number. When Davis explained that he was just using the number given to him by a fellow officer, his explanation of the mistake was accepted and no disciplinary action was taken. R. 29 (Pl.'s Stmt. Facts at 3) (Page ID #669).

The main fact dispute, however, arises over an attempted traffic stop on December 17, 2008. Davis was driving northbound on Highway 41A in an unmarked police vehicle when he observed a white Caravan, driving at a high rate of speed, run the traffic light at the intersection with Cunningham Lane. R. 34-1 (Davis Dep. at 62-66) (Page ID # 696-97). Davis attempted to conduct a traffic stop of the vehicle, including flashing his blue lights and at one point exiting his vehicle and approaching the van in an effort to get the driver to stop. *See* R. 17-1 (Resps. to Interrogs. at 17) (Page ID #86). When the vehicle instead ran through another light, Davis testified at his deposition that he got back in his vehicle, activated his sirens, and radioed the police dispatch. R. 34-1 (Davis Dep. at 77-80) (Page ID #700). Dispatch instructed him to "back off" and notify the Oak Grove police department, which Davis did. R. 17-1 (Resps. to Interrogs. at 17) (Page ID #86).

During the incident, a civilian driver named Lisa Hendrickson called 911 at approximately the same time as Davis was on the phone with dispatch. *Compare* R. 17-11 (Davis Call Log) (Page ID #182) *with id.* (Hendrickson Call Log) (Page ID #183). In the call, she indicates that an undercover officer had just tried to stop a vehicle at an intersection on Fort Campbell Boulevard (another name for Highway 41A) near the military base and had pulled a gun on the subject at the light. R. 17-11 (Hendrickson Call Log) (Page ID #183). She later identified the location as the light near a Mapco Express and one of the gates to Fort Campbell, which she agreed was Jack Miller Boulevard. R. 17-10 (Pre-Decision Hr'g Tr. at 147-48) (Page ID #176). Davis maintains that he was not near Jack Miller Boulevard during the incident and that this witness must have observed a different white Caravan or a different officer exit his vehicle and draw his weapon. *See* R. 32 (Pl.'s Stmt. Facts at 6) (Page ID #672) ("The witness identified an officer other than Plaintiff.").

Davis prepared several incident reports and arrest-warrant affidavits relating to this incident. In these reports, he explicitly states that "[a]t no time did I unholster my weapon." R. 17-11 (Internal Report) (Page ID #181). He also provides inconsistent accounts of when he exited his vehicle. *Compare id.* ("At 41A/Quinn I exited my vehicle.") *with id.* (Incident Report) (Page ID #187) ("[W]hen vehicle reached 41A/Pkwy affiant notified dispatchers of situation and exited vehicle."). And the list of which traffic lights the white van ran through also varies from report to report. *Compare id.* (Internal Report) (Page ID #181) (citing "Cunningham," "Quinn," and "Parkway") *and id.* (Incident Report) (Page ID #187) (same) *with id.* (12/17/08 Probable Cause Aff.) (Page ID #192) (citing "Cunningham," "Quinn," "Parkway," and "Ringgold") *and id.* (12/18/08 Probable Cause

Aff.) (Page ID #198) (citing "Cunningham," "Quinn," "Parkway," "Ringgold," and "Lady Marion");

*see also* R. 34-1 (Davis Dep. at 87) (Page ID #702) (testifying that he lost visual sight of van

"between Ringgold Road and Lady Marion").

Davis agrees that any time an officer unsuccessfully attempts to stop a vehicle, called a "non-

pursuit,"[2] the police investigate the incident. R. 32 (Pl's Stmt. Facts at 8) (Page ID #674). Chief

Ansley testified that the incident first went to Internal Affairs, which then sent the incident to the

command staff for review.[3] R. 17-4 (Ansley Dep. at 26) (Page ID #105). Because the command

staff believed this was in fact a pursuit and had some concerns about the discrepancies in Davis's

reports, Chief Ansley initiated an internal investigation. *Id.* at 27 (Page ID #106). He assigned the

case to Lieutenant Ward, who in turn assigned it to Sergeant Timothy Saunders in the Professional

Integrity Unit for investigation. *Id.*; *see also* R. 17-12 (Saunders Aff. at ¶ 3) (Page ID #201). Davis

has not accused Sergeant Saunders of any racial animus; in fact, Saunders is one of the African

American officers Davis claims was also subjected to racial hostilities at work. Appellant Br. at 9.

Saunders called Lisa Hendrickson to question her about the events and questioned Davis about the

inconsistences in his report. Saunders's findings were turned over to Lieutenant Ashby, who

---

[2]If the suspect flees and the officer then pursues, it would be called a "pursuit." *See* R. 29-1 (Ansley Dep. at 25) (Page ID #628).

[3]Davis claims that the command staff consists of Bill Carney, Frank Gray, Ron Knight, and Mike Parr, all officers that Chief Ansley knew previously demonstrated racial animosity. R. 27 (Pl.'s Opp. to Summ. J. at 2-3) (Page ID #590-91). Chief Ansley testified that the command staff at the time consisted of Frank Gray, Ron Knight, Mike Parr, Craig Gipson, and Rick Stalder. R. 17-4 (Ansley Dep. at 26) (Page ID #105).

recommended that Davis be terminated for untruthfulness. *See* R. 17-10 (Pre-Decision Hr'g Tr. at 3-4) (Page ID #168).

Chief Ansley then held a pre-decision hearing, in which Davis was questioned regarding the incident. Davis played the recordings of both his conversation with dispatch and Sergeant Saunders's interview with Lisa Hendrickson. Hendrickson was interviewed by Sergeant Saunders on December 29, 2008, and she stated that she could not recall the exact intersection but that it was near a gas station and either Gate One or Gate Three for Fort Campbell. R. 17-10 (Pre-Decision Hr'g Tr. at 141-42) (Page ID #175). Saunders asked her if she maybe meant near the Walmart, which is located on Quin Lane just before 101st Airborne Parkway, and she was adamant that it was closer to the Fort than the Walmart. *Id.* at 142 (Page ID #175). He suggested maybe near Gate One and the Mapco Express and she said "Yes." *Id.* When Sergeant Saunders later confirmed that this was Jack Miller Boulevard, she again said "Yes." *Id.* at 145, 148. She testified that the white Caravan stopped at this light even though nobody was in front of it, but then an undercover police officer stopped his car behind the van, "got out, drew his gun," and then, when the light turned green, the van took off, and the officer got back in his car and followed. *Id.* at 148. The officer's vehicle was unmarked and had its lights on, but Hendrickson did not hear sirens. *Id.* at 148-49.

Davis's conversation with dispatch was also played, but Davis claims that the version he was given by the County (which he admits is administratively separate from the City) was different from the initial version played to him by Sergeant Saunders. Davis believes that the City doctored the tape to suggest that Davis himself said he was near Jack Miller Boulevard, which was his location

reflected in the call log. *See* R.17-11 (Davis Call Log) (Page ID #182) ("traveling nb coming up on jack miller"); R. 17-10 (Pre-Decision Hr'g Tr. at 129) (Page ID #172) (transcription of recording: "He just went through another red light at, uh, 41 and Jack Miller."). Davis conceded to Chief Ansley that it was his voice on the tape, *id.* at 130 (Page ID #172), but maintained that when he called he was at 101st Airborne Parkway and not Jack Miller Boulevard. R. 17-10 (Pre-Decision Hr'g Tr. at 129) (Page ID #172). Davis testified at his deposition that another officer later radioed him to ask his location, and only then did Davis state that he was at Jack Miller Boulevard. R. 34-1 (Davis Dep. at 89) (Page ID #703). Davis explained to Chief Ansley that someone must have spliced his words and added sirens to the background to create the altered recording. R. 17-10 (Pre-Decision Hr'g Tr. at 137-39) (Page ID #174). Davis admits, however, that neither Chief Ansley nor Sergeant Saunders themselves had access to the recording or asked anyone to tamper with the recording. R. 32 (Pl.'s Stmt. Facts at 9) (Page ID #675). And Davis could offer Chief Ansley no explanation for how the recording was altered. At the end of the hearing, Chief Ansley concluded that Davis had in fact been dishonest and terminated him. R. 17-10 (Pre-Decision Hr'g at 182) (Page ID #180).

The record reflects at least three other officers who were investigated for allegations of untruthfulness during Chief Ansley's tenure: Jon Cummings, John Price, and James Moore. Officer Cummings allegedly lied about leaving a conference early. Chief Ansley decided termination was appropriate, and Officer Cummings voluntarily resigned instead. *See* R. 32 (Pl.'s Stmt. Facts at ¶¶ 38-39) (Page ID #678). Officer Price allegedly lied about the number of hours he worked. Chief Ansley again recommended termination and permitted Officer Price to resign voluntarily instead.

*Id.* at ¶ 40 (Page ID #678). Officer Moore allegedly lied about how a department-issued cell phone had been damaged. Officer Moore was given a hearing, during which Chief Ansley concluded that Officer Moore had simply misunderstood the initial question, and the charge of untruthfulness was not sustained. *Id.* at ¶ 44 (Page ID #679-80). All three of these officers are Caucasian.[4]

In March, 2009, Davis filed for and obtained a right-to-sue letter from the EEOC challenging his termination on the basis of retaliation. He did not claim that the conduct was a continuing action or identify any other form of discrimination other than retaliation. *See* R. 17-2 (EEOC Charge) (Page ID #93). On June 25, 2009, Davis sued the City raising various state and federal employment-discrimination claims.[5] The City moved for summary judgment on all claims, which the district court granted.[6] Davis appeals the grant of summary judgment on only the claims relating to his termination—unlawful discrimination and retaliation—under federal and state law.

---

[4]Davis repeatedly states on appeal and below that "[w]hite officers have been found to be untruthful in an internal investigation of misconduct and not terminated by Chief Ansley." Appellant Br. at 10. However, the only names he mentions, even on appeal, are "Moore and Blackman." *Id.* at 18. As noted by the district court, there is no evidence in the record at all regarding an Officer Blackman. *See* R. 46 (D. Ct. Order at 14) (Page ID #923).

[5]Specifically, Davis claimed a racially hostile work environment and retaliation under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-101 and 4-21-401, as well as state-law claims of malicious harassment and outrageous conduct.

[6]Davis conceded before the district court that he did not have valid claims of malicious harassment and outrageous conduct under state law or a valid claim under 42 U.S.C. § 1981. R. 27 (Pl.'s Opp. to Summ. J. at 1 n.1) (Page ID #589). Davis also made no arguments before the district court with respect to his hostile work environment claim or allegations of micro-managing and cold-shoulder treatment. *See* R. 46 (D. Ct. Order at 7-9) (Page ID #916-18). Davis does not appeal the denial of any of these claims.

## II.  STANDARD OF REVIEW

We afford de novo review to a district court's grant of summary judgment. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004).  Under Federal Rule of Civil Procedure 56(a), the moving party is entitled to summary judgment if there are no genuine issues of material fact and the claims may be resolved as a matter of law.  Fed. R. Civ. P. 56(a).  On summary judgment, we construe the evidence in the light most favorable to the non-moving party, here Davis. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.*  However, once the moving party has put forth sufficient evidence in support of summary judgment, the non-moving party must come forward with specific evidence to justify sending his claims to trial. *Id.* at 250.

## III.  MOTION TO TAKE JUDICIAL NOTICE

As a preliminary matter, we must resolve Davis's motion for this court to take judicial notice of certain exhibits not filed in the district court.  After failing to attach certain exhibits to his opposition to the City's summary-judgment motion, Davis unsuccessfully tried to supplement the record before the district court and this court. *See* R. 56 (8/24/2011 D. Ct. Order) (denying motion to supplement); *Davis v. City of Clarksville*, No. 11-5040 (6th Cir. Oct. 26, 2011) (order) (denying motion to supplement).  Currently pending is a motion by Davis for this court to take judicial notice of the exhibits.  We decline to do so.

We may take judicial notice of "a fact that is not subject to reasonable dispute" either because such a fact "is generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Davis asks us to take judicial notice of additional excerpts from the deposition of Chief Ansley as well as his complaint from the 2006 suit and numerous depositions and affidavits taken from other litigation. *See* Appellee's Opp. to Judicial Notice at 6-7 (summarizing origins of documents). Certainly, we could take judicial notice of the existence of these documents as evidence that a complaint was in fact filed or a deposition was in fact taken. *See United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012). But it is not the existence of these documents that Davis seeks for us to acknowledge; rather, he seeks to rely on the substantive facts within those exhibits, many of which are disputed, to support his appeal. His motion is therefore more properly viewed as yet another attempt to supplement the record and is denied for the reasons set forth in our earlier order. *See Molnar v. Care House*, 359 F. App'x 623, 625 (6th Cir. 2009) (unpublished opinion) (construing motion for judicial notice on appeal as motion to supplement the record), *cert. denied*, 131 S. Ct. 188 (2010).

## IV. CLAIM OF UNLAWFUL RACIAL DISCRIMINATION

Title VII prohibits discriminating against an employee on the basis of his race. 42 U.S.C. § 2000e-2(a)(1). Where, as here, the plaintiff lacks direct evidence of discriminatory intent, we employ the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973), to evaluate his claim.[7] The plaintiff has the initial burden of presenting evidence from which a jury could conclude that the plaintiff has made a prima facie showing of racial discrimination. *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009). If the plaintiff meets this burden, the employer has the burden of producing admissible evidence of a legitimate, nondiscriminatory reason for its actions. *Id.* The plaintiff must then identify evidence from which a jury could conclude that the employer's stated reason is merely a pretext for racial discrimination. *Id.* At all times the burden of persuasion remains with the plaintiff. *Id.*

To make out a prima facie case of discrimination under Title VII, a plaintiff must show "(1) that he is a member of a protected group; (2) that he was subject to an adverse employment action; (3) that he was qualified for the position from which he was fired; and (4) that he was treated differently than employees outside of the protected class for the same or similar conduct." *Singfield*, 389 F.3d at 561. The parties agree that Davis has satisfied the first three elements—Davis is an

---

[7]Davis's brief discusses the differing legal frameworks for when a plaintiff has direct evidence or circumstantial evidence. *See* Appellant Br. at 14-16. However, Davis does not purport to have direct evidence of racial animus behind his termination, and he himself applies the *McDonnell Douglas* burden-shifting framework for circumstantial evidence to his own claims. We also note that despite consistently using the single-motive framework on appeal and before the district court, Davis occasionally states that race was "a motivating factor" in his termination. *See* Appellant Br. at 16; R. 27 (Pl.'s Opp. to Summ. J. at 8-9) (Page ID #597-98); *but see* R. 1 (Compl. at ¶ 18) (Page ID #3) ("Plaintiff's termination was . . . motivated by his race."); Appellant Br. at 25 ("Defendant's race and prior prosecution . . . were the motivating factors in his treatment."). Title VII mixed-motive claims are reviewed using a more plaintiff-friendly standard on summary judgment, not the *McDonnell Douglas* framework. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400-02 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 2380 (2009). However, in light of Davis's own application of *McDonnell Douglas* to his claims, his inconsistent language suggesting either a single motive or a mixed motive, and his failure to challenge the district court's treatment of his claims as single-motive, we do not treat his claim as one of mixed motive under 42 U.S.C. § 2000e-2(m).

African American, his employment was terminated, and he was qualified for his position. The only issue is whether Davis has identified similarly situated employees not of the protected class who were treated differently.

To be similarly situated in the disciplinary context, "the plaintiff and his proposed comparator must have engaged in acts of comparable seriousness." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006) (internal quotation marks and emphasis omitted). We consider "whether the individuals have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* The plaintiff's obligation is not to show an exact correlation with another employee, but instead that "the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself [are] similar in all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks omitted).

The district court held that Davis had failed to identify a non-protected individual "who was investigated for untruthfulness, was ultimately found untruthful, and subsequently retained his position." R. 46 (D. Ct. Order at 15) (Page ID #924). We disagree that these were the correct parameters for identifying a similarly situated employee to Davis. Where, as here, the plaintiff disputes that he engaged in the conduct for which he was disciplined, the principles of summary judgment counsel against considering the truth of the alleged misconduct in identifying a similarly situated individual. As we did in *Wright*, a case where the plaintiff also disputed the underlying

facts, we must instead focus on the similarities of the *alleged* misconduct. *See Wright*, 455 F.3d at 710. We ultimately held that "Wright and Bradley [were] not similarly situated because their alleged acts of misconduct are of a very different nature, and there are legitimate reasons why [the employer] would" punish each differently if the alleged misconduct were found true. *Id.*; *see also Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 411-12 (6th Cir. 2008) (holding improper to rely on defendant's version of facts when identifying similarly situated employees).

Here, Moore and Davis were both accused of comparable misconduct—dishonesty to a superior—and their conduct and statements were evaluated by the exact same supervisor, Chief Ansley. We do not consider that the department ultimately found Moore to be merely confused and Davis untruthful because the validity of those findings is what Davis disputes. The plaintiff's burden of establishing a prima facie case "is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). And we "may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case," because doing so would deprive Davis of the opportunity of demonstrating that the employer's reason was merely pretext. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc). Davis has met his burden of establishing a prima facie case because he identified a white officer, Officer Moore, who was also accused of untruthfulness but was not terminated following an investigation into his acts by Chief Ansley.

The burden therefore shifts to the City to offer admissible evidence of a legitimate, non-discriminatory reason for terminating Davis's employment. *Clay v. United Parcel Serv.*, 501 F.3d

695, 705-06 (6th Cir. 2007). The City has satisfied its burden because it has identified the City's policy against dishonesty, past instances of termination based on dishonesty, and a basis in the record for its belief that Davis was dishonest: the inconsistent reports he filed and the eyewitness testimony that conflicted with Davis's version of events. The burden thus shifts back to Davis to offer evidence sufficient for a jury to find that the employer's reason was pretext.

A plaintiff may demonstrate pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). To survive summary judgment, Davis "must produce sufficient evidence from which a jury could reasonably reject" the City's explanation why it fired him. *Id.* Here, Davis challenges the factual basis underlying his termination. He has testified under oath at his deposition that he was not dishonest; he did not draw a gun when pursuing the white van, and he was not at the same intersection as the eyewitness who saw an officer draw his weapon. Although the City has certainly presented ample evidence to counter Davis's testimony—the independent eyewitness account and the alleged recording of Davis putting him at Jack Miller Boulevard—we will not question Davis's credibility in reviewing summary judgment. *Anderson*, 477 U.S. at 255.

Even when a plaintiff has demonstrated an issue of fact regarding the validity of the factual basis underlying his termination, an employer may still defeat an inference of pretext if it can demonstrate that it held an "honest belief" in its reasons for taking the adverse action. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998). "When an employer reasonably and honestly

14

relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen*, 580 F.3d at 401 (internal quotation marks omitted). The City's investigation need not be perfect so long as the decision was "a reasonably informed and considered" one. *Wright*, 455 F.3d at 708. The employer bears the burden of identifying the particularized facts that it reasonably relied upon in order to rebut the inference of pretext. *Clay*, 501 F.3d at 714-15.

Here, the City has offered evidence that it conducted a reasonable investigation and relied on particularized facts in terminating Davis for dishonesty. The City appointed Timothy Saunders, an officer with no past history of racial animus, to investigate the allegation of untruthfulness and interview Davis and the potential eyewitness. Numerous reports written by Davis himself, which he does not claim were doctored, present inconsistent information about the incident on December 17, 2008. There is a recording of Davis stating in his own voice that he was at a different location. Chief Ansley conducted a two-day pre-decision hearing during which Davis was allowed to fully explain his version of the events and his reasons for believing that the dispatch record of his call was altered. Chief Ansley also heard the recording of Sergeant Saunders's call with Lisa Hendrickson, the third-party witness, who testified that she saw an officer in an unmarked vehicle attempt to pull over a white van by exiting his car with his weapon drawn. Davis did not dispute attempting to pull over a white van and at one point exiting his car and approaching the driver. Chief Ansley also had access to the call logs of both Davis and Hendrickson suggesting that the incidents were at or near

the same time. On the basis of this evidence, the City determined that Davis was untruthful about the events on December 17, 2008, and terminated his employment.

The City is not required to be factually correct in its assessment of Davis's behavior so long as the City has an "honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation." *Wright*, 455 F.3d at 709 (holding employer had honest belief based on thoroughness of investigation). Although Davis has consistently maintained that he was never dishonest, he has not challenged the sufficiency of Saunders's or Ansley's investigation or the process that he received leading up to his termination. Furthermore, Davis has "offered no evidence to indicate that [the City] made its decision on grounds other than those offered." *Id.* at 709. The City has adequately identified particularized facts supporting the thoroughness of its investigation and its honestly held belief that Davis was untruthful and not merely mistaken.

Because we review summary judgment de novo, we may affirm on any ground presented in the record. *City Mgmt. Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994). Therefore, although we disagree with the district court's determination that Davis failed to establish a prima facie case of discrimination, we nonetheless affirm the grant of summary judgment in favor of the City on Davis's claims of racial discrimination under Title VII. His claims under the Tennessee Human Rights Act ("THRA") must therefore fail as well. *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 993 (6th Cir. 1999) (holding THRA claims apply same framework as Title VII).

## V. CLAIM OF UNLAWFUL RETALIATION

Title VII and the Tennessee Human Rights Act also both prohibit retaliating against someone who complains about racial discrimination. 42 U.S.C. § 2000e-3; Tenn. Code Ann. § 4-21-301. To state a prima facie claim of retaliation under Title VII or the THRA, a plaintiff must show that (1) he engaged in conduct protected by Title VII; (2) his protected conduct was known to the defendant; (3) the defendant thereafter took an adverse action against the plaintiff; and (4) a causal connection linked the protected activity and the adverse action. *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) (applying Title VII framework for THRA claims). The parties concede that the plaintiff has met his burden on the first three elements: Davis's lawsuit was protected conduct, the defendant knew of the lawsuit, and the plaintiff was terminated after the filing of the lawsuit. The only issue on appeal is whether Davis demonstrated a material issue of fact regarding a causal connection between Davis's lawsuit and his termination.

We employ the same burden-shifting framework to retaliation claims as we do to employment-discrimination claims. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). This means that even if Davis establishes a prima facie case of retaliation, he would still be required to establish pretext because the City has articulated a legitimate, nondiscriminatory reason for his termination. As discussed above, the City has defeated any inference of pretext because the City has sufficiently demonstrated a reasonably held belief based on particularized facts that Davis had been untruthful. We therefore need not consider whether the district court properly concluded that Davis had failed to make a prima facie showing on the element of causation. Summary

judgment is appropriate on Davis's retaliation claims under federal and state law as well. *Chen*, 580

F.3d at 402.

## VI. CONCLUSION

For the aforementioned reasons, we **AFFIRM** the district court's grant of summary judgment

to the defendant.