RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MARK CHANGIZI; MICHAEL P. SENGER; DANIEL KOTZIN,

        *Plaintiffs-Appellants*,

    *v.*

DEPARTMENT OF HEALTH AND HUMAN SERVICES; VIVEK MURTHY, in his official capacity as U.S. Surgeon General; XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services,

        *Defendants-Appellees*.

> No. 22-3573

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:22-cv-01776—Edmund A. Sargus, Jr., District Judge.

Argued: June 15, 2023

Decided and Filed: September 14, 2023

Before: BOGGS, WHITE, and BUSH, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** John J. Vecchione, NEW CIVIL LIBERTIES ALLIANCE, Washington, D.C., for Appellants. Daniel Winik, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** John J. Vecchione, Jenin Younes, NEW CIVIL LIBERTIES ALLIANCE, Washington, D.C., for Appellants. Daniel Winik, Daniel Tenny, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Lawrence S. Ebner, ATLANTIC LEGAL FOUNDATION, Washington, D.C., Deborah J. Dewart, Hubert, North Carolina, Eugene Volokh, UCLA SCHOOL OF LAW, Los Angeles, California, Sarah Harbison, PELICAN INSTITUTE FOR PUBLIC POLICY, New Orleans, Louisiana, Nicole Saad Bembridge, NETCHOICE, Washington, D.C., Thomas A. Berry, CATO INSTITUTE, Washington, D.C., Talmadge Butts, FOUNDATION FOR MORAL LAW, Montgomery, Alabama, B. Tyler Brooks, LAW OFFICE OF B. TYLER BROOKS, PLLC, Greensboro, North Carolina, Thomas Brejcha, THOMAS MORE SOCIETY, Chicago, Illinois, Alan Gura,

INSTITUTE FOR FREE SPEECH, Washington, D.C., Ilya Shapiro, MANHATTAN INSTITUTE, New York, New York, for Amici Curiae.

———————————

**OPINION**

———————————

JOHN K. BUSH, Circuit Judge.  Several Twitter users were temporarily or permanently banned from the platform for posting alleged COVID-19 misinformation.  Rather than sue Twitter, these users chose to sue the United States Department of Health and Human Services, its Secretary, and the United States Surgeon General (collectively, HHS).  Though these users asserted claims under the First Amendment, Fourth Amendment, and Administrative Procedure Act, the district court dismissed their complaint for lack of jurisdiction and failure to state a claim.  On appeal, we ask: are Twitter's actions traceable to the federal government?  Based on the facts alleged in the complaint, no.  We affirm.

**I.**

Twitter[1] is a ubiquitous social-media platform that allows users to electronically communicate by posting and engaging with limited-length messages called "tweets."  This marketplace of ideas has historically avoided censorship, but shortly after the COVID-19 pandemic began, Twitter announced that it was broadening its definition of censorable, harmful information to include "content that goes directly against guidance from authoritative sources of global and local public health information" (COVID-19 policy).  R1, PageID 7.  Over the next year, "Twitter . . . ramp[ed] up [its] efforts to quell the spread of 'misleading' COVID-19 information" several times, but few users were suspended until Twitter upped the ante on March 1, 2021.  *Id.*  From then on, Twitter announced that it would permanently suspend any user who received five or more infractions for violating the platform's COVID-19 policy.

Mark Changizi, Michael Senger, and Daniel Kotzin (collectively, Plaintiffs) are Twitter users who, by March 2020, began to use their accounts to question responses to the COVID-19

---

[1]Twitter is rebranding as "X." Consistent with the complaint, we continue to refer to the entity as "Twitter."

pandemic. This activity earned them many followers, but between April 2021 and March 2022, they suffered multiple temporary suspensions. Twitter suspended Changizi three times, Senger twice, and Kotzin twice for violating the platform's COVID-19 policy.[2] Plaintiffs also allege that, as early as May 2021, Twitter began to "de-boost" Changizi's tweets, meaning that his tweets appeared less often on users' Twitter feeds and that his replies to other posts were hidden.

According to the complaint, the Biden administration first entered the fray on May 5, 2021. That day, White House Press Secretary Jen Psaki stated that "[t]he President's view is that the major [social-media] platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19 vaccinations," and "there's more that needs to be done to ensure that this type of misinformation . . . is not going out to the American public." *Id.* at PageID 8.

Two months later, the Surgeon General released an advisory statement, the "July Advisory," related to COVID-19 misinformation. In it, he discussed the problems that COVID-19 misinformation had caused, identified social-media platforms as a source of this misinformation, and (according to Plaintiffs) "command[ed] technology platforms" to take several steps. *Id*. at PageID 9. This included collecting data on the spread of misinformation, improving misinformation monitoring, imposing clear consequences for accounts that repeatedly violate platform policies, and amplifying communications from COVID-19 subject-matter experts.

Later that day, the Surgeon General held a press conference with the Press Secretary and said that technology companies "have enabled misinformation to poison our information environment with little accountability" by "allow[ing] people who intentionally spread misinformation . . . to have extraordinary reach." *Id.* at PageID 10. On behalf of HHS, he asked social-media platforms "to operate with greater transparency and accountability[,] . . . monitor misinformation more closely[,] . . . [and] consistently take action against misinformation super spreaders on their platforms." *Id.* The Press Secretary added that the federal government had "increased disinformation research and tracking within the Surgeon General's office . . . [and

---

[2]One of Changizi's suspensions was not explicitly linked to a violation of Twitter's COVID-19 policy.

had] flagg[ed] problematic posts for Facebook that spread disinformation." *Id.* The administration had also "proposed changes . . . to social media platforms[,]" including recommendations that they (1) "publicly share the impact of misinformation on their platform[,]" (2) "create a robust enforcement strategy[,]" (3) "take faster action against harmful posts[,]" and (4) "promote quality information sources in their feed algorithm." *Id.* at PageID 10–11.

The next day, July 16, 2021, the Press Secretary clarified that the Biden administration was "in regular touch with social media platforms . . . about areas where we have concern [and] information that might be useful." *Id.* at PageID 11. This included engaging with platforms "to better understand" their enforcement policies. *Id.* President Biden later told reporters that social media platforms are "killing people" with COVID-19 misinformation. *Id.* at PageID 13. Several days later, *USA Today* reported that the "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms." *Id.* (citation omitted)

Six months later, in January 2022, the Surgeon General said, social media "platforms still have not stepped up to do the right thing" and control COVID-19 misinformation. *Id.* And on March 3, 2022, the Surgeon General issued a request for information (RFI) asking "technology platforms" to provide the Department of Human Health and Human Services with data concerning "sources of COVID-19 misinformation" by May 2, 2022. *Id.* at PageID 14. Technology platforms faced no penalty for declining to share information, and the RFI warned companies against submitting any "personally identifiable information" related to their users.[3]

Particularly relevant for this appeal are the dates of Plaintiffs' most recent disciplinary actions. On September 24, 2021, Kotzin received a 24-hour suspension for violating Twitter's COVID-19 policy. On December 18, 2021, Changizi's account was permanently suspended for violating Twitter's COVID-19 policy. It was reinstated nine days later, but remains "heavily censored" by the platform, according to Changizi. *Id.* at PageID 18–19. Several months later, Kotzin received his second temporary suspension, this time for seven days, on March 7, 2022, and Senger was permanently suspended on March 8, 2022.

---

[3]Dep't of Health and Hum. Servs., Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information (Mar. 10, 2022), https://www.regulations.gov/document/HHS-OASH-2022-0006-0001.

Plaintiffs sued HHS, seeking injunctive relief, declaratory relief, and nominal damages to remedy HHS's unlawful efforts to "instrumentalize[] Twitter" to "silenc[e] opinions that diverge from the White House's messaging on COVID-19." *Id.* at PageID 4, 30. The district court dismissed their complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure.[4] This appeal followed.

## II.

Article III of the United States Constitution limits "[t]he judicial Power" of the federal courts to cases and controversies. U.S. Const. art. III, § 2. One prerequisite for a cognizable case or controversy "is that the parties have standing to bring it." *Hagy v. Demers & Adams*, 882 F.3d 616, 620 (6th Cir. 2018). As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing the "irreducible constitutional minimum" of standing: (1) they suffered an injury in fact, (2) caused by HHS, (3) that a judicial decision could redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And when, as here, Plaintiffs' alleged injury "arises from the government's allegedly unlawful regulation . . . of *someone else*, much more is needed [to establish standing]." *Id.* at 562; *see also Allen v. Wright*, 468 U.S. 737, 757–58 (1984) (noting that it is "substantially more difficult" to establish standing when plaintiffs are not themselves the object of government action), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Plaintiffs allege several direct and indirect injuries flowing from HHS's alleged coercion, some of which are insufficiently particularized to establish injury-in-fact. But even if we assume that Plaintiffs have satisfied the injury-in-fact element of Article III standing through their allegation of threatened and actual censorship, *see California v. Texas*, 141 S. Ct. 2104, 2114 (2021), Plaintiffs fail to establish traceability.[5]

---

[4]On review of a dismissal order for facial lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), we are limited to only the facts as alleged in the complaint. *See Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

[5]HHS filed a motion for the panel to take judicial notice of certain facts not in the record that may have mooted most, if not all, of Plaintiffs' claims and requested relief. But we have discretion to choose the order in which we address non-merits grounds for dismissing a suit. *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 536 (6th Cir. 2021) (citing *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007)). Because we affirm the district court's dismissal of Plaintiffs' complaint for lack of standing, we deny HHS's motion as moot.

Traceability looks to whether a defendant's actions have a causal connection to a plaintiff's injuries. *Lujan*, 504 U.S. at 560. Causation need not be proximate, so an indirect injury can support standing. *Lexmark Int'l, Inc.*, 572 U.S. at 134 n.6; *see United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 688-89 (1973). But "'an injury that results from [a] third party's voluntary and independent actions' does not establish traceability." *Turaani v. Wray*, 988 F.3d 313, 317 (6th Cir. 2021) (quoting *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 457 (6th Cir. 2017)). Thus, a plaintiff must show that the defendant's actions had a "determinative or coercive effect" on the third party such that the actions of the third party can be said to have been caused by the defendant. *See Bennett v. Spear*, 520 U.S. 154, 169 (1997); *see also Turaani*, 988 F.3d at 316 (explaining "[a]n indirect theory of traceability requires that the government cajole, coerce, [or] command"). That the defendant is the federal government does not change this assessment. *See, e.g.*, *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989) ("Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the Amendment protects against such intrusions if the private party acted as an instrument or agent of the Government.").

By this metric, Plaintiffs' complaint falls short. Plaintiffs maintain that the timing of Twitter's actions related to the RFI and the July Advisory as well as the public statements made by the Surgeon General, Press Secretary, and President Biden all support an inference that Twitter's disciplinary measures are state action attributable to HHS. But Plaintiffs fail to adduce facts demonstrating that the decisions Twitter made when it enforced its own COVID-19 policy did not result from its "broad and legitimate discretion" as an independent company. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989).

Consider first the timeline. According to the complaint, Twitter created and enforced its first COVID-19 policy long before the Biden Administration made any public statements and, in fact, before there was a Biden Administration. Indeed, Twitter first announced that it "would censor" COVID-19 misinformation in March 2020, but Plaintiffs' first-cited government "action" was a statement made on May 5, 2021, by Press Secretary Psaki. R1, PageID 8. And over the next year, Twitter "continued to ramp up efforts to quell the spread of 'misleading'

COVID-19 misinformation," by creating additional warnings for misleading tweets and removing tweets with false or misleading information about COVID-19 and COVID-19 vaccinations.[6] *Id.* Accepting Plaintiffs' allegation that Twitter "rarely suspended users" for spreading misleading information about COVID-19 before March 1, 2021, that was still two months before any alleged government action, and four months before HHS made its first statement. *See id.* at PageID 7–9. Thus, many of Twitter's changes to its own COVID-19 policy and enforcement policy preceded the government actions that purportedly coerced Twitter to censor Plaintiffs.

But Plaintiffs have a response to this timeline discrepancy—senior officials from the Trump or Biden Administrations engaged in "behind the scenes communications" at some undisclosed point before the first public statements. Appellant's Br. at 20. But lacking any details in the complaint of any purported communications, let alone specific allegations of the content of behind-the-scenes communication, this "bare assertion of conspiracy" alone cannot remedy their timeline discrepancy. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007). Plaintiffs reply that they "had no conceivable means of acquiring concrete information to corroborate [this] supposition[] without a discovery order." Appellant's Br. at 20. But federal courts will not "unlock the doors of discovery" for a fishing expedition based on a plaintiff's speculative assertions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

Because Plaintiffs have not adequately pleaded that HHS compelled Twitter's chosen course of conduct, we are left with a "highly attenuated chain of possibilities" that is too speculative to establish a traceable harm. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Therefore, the district court must be affirmed.

In reaching this conclusion, we acknowledge that a different result could be possible under different facts. This would be a different case if, for example, additional facts were alleged in the complaint that would allow a conclusion that, under the totality of the circumstances, Twitter's actions were compelled or coerced by the federal government. *See,*

---

[6]Twitter amended its policies on May 11, 2020, and again on December 16, 2020, by "broadening the definition [of harmful information] and explaining that [misleading COVID-19 information] could be labeled or even removed."

*e.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1004–05 (1982); *Skinner*, 489 U.S. at 614–15. But as befits this stage of the litigation, our review is confined to the allegations as they appear in the complaint. *See Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016). Plaintiffs' bare-bones request in a footnote that we take judicial notice of the existence of evidence that arose in cases not before us does not alter this standard.[7]

## III.

For all these reasons we AFFIRM the district court's judgment.[8]

---

[7]Moreover, judicial notice is available only for facts that are not subject to "reasonable dispute." Fed. R. Evid. 201(b). While we could conceivably take judicial notice of the fact that an analogous case is ongoing in another circuit, Plaintiffs ask us to take judicial notice of the truth of assertions detailed in various judicial filings. *See Davis v. City of Clarksville*, 492 F. App'x 572, 578 (6th Cir. 2012). Judicial notice is not a work-around for Plaintiffs' untimely motion to amend their complaint, so we deny their footnote request. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014).

[8]This opinion should be understood as dealing only with the particular case before us. The general concerns raised by the appellants here are not phantasmagorical, and on a different set of allegations might survive at the motion-to-dismiss stage. It may be difficult to draw a line between government actions where allegations might survive dismissal under the standard of actions that would "coerce or compel private actors" and those that are simply the policy or political statements of an administration. In some circumstances that question might require determination by a finder of fact.

On the other hand, we should be mindful that throughout history, in the course of ordinary political discourse, our government has made quite clear its displeasure with actions taken by private parties, whether President Kennedy's pointing out government actions against steel executives because of their economic decisions, The President's News Conference of April 11, 1962, 1 PUB. PAPERS 315–17 (Apr. 11, 1962), or President George Bush's press secretary telling reporters in the wake of 9/11 that "all Americans . . . need to watch what they say," White House Office of the Press Secretary, Press Briefing by Ari Fleischer (Sept. 26, 2001).

And, of course, the larger and more powerful government becomes, with the ability to affect more and more aspects of private life, the more porous the boundary between government speech and coercion might become.

In *Missouri v. Biden,* No. 23-30445, 2023 WL 5821788 (5th Cir. Sept. 8, 2023), these issues were addressed on a more comprehensive scale, not based on actions with respect to discrete individual plaintiffs, as in the case we have before us. We express no opinion as to how these principles that we have laid out in this opinion would apply to different factual allegations.