Jeremy JENNINGS, Plaintiff–
Appellant,

v.

COUNTY OF MONROE, Monroe Coun-
ty E 911 Service, Tilman Crutchfield,
Thomas Moore, Daniel Donahue, Rob-
ert Neely, and Larry Buckinham, De-
fendants–Appellees.

No. 14–2545.

United States Court of Appeals,
Sixth Circuit.

Nov. 16, 2015.

BEFORE: GIBBONS and McKEAGUE, Circuit Judges; ANDERSON, District Judge.*

## OPINION

McKEAGUE, Circuit Judge.

Jennings was terminated from his position as the Assistant Director of Monroe County E 9-1-1 Service District (Central Dispatch) in May 2012 for off-duty conduct that called his judgment into question. He subsequently filed suit against Monroe County, Central Dispatch, and five members of its board of directors (collectively, "the County"), raising discrimination and retaliation claims under the Americans with Disabilities Act of 1990 as well as bringing a civil rights claim for the County's denial of his request for a name-clearing hearing. The district court granted the County's motion for summary judgment as to all counts, and Jennings now appeals. Jennings has not provided sufficient evidence on which a reasonable jury could find that the County's proffered reason for termination was a pretext for discrimination. As to the civil rights claim, Jennings has not provided sufficient evidence that the statement made was stigmatizing and false. Accordingly, we affirm.

## I

Central Dispatch handles the emergency calls for Monroe County. As Assistant Director, Jennings was responsible for the efficient day-to-day operation of the Central Dispatch Communication Center. He was also required to be on-call in the event of any emergency situation or any issues with any employee or equipment. Jennings' supervisor was Alan Frank, the Director of Central Dispatch.

*History of PTSD.* In early 2011, Jennings filed a whistleblower lawsuit against Monroe Township because he had been demoted from his position as a lieutenant volunteer for the fire department. Jennings asserts that the resulting stress surrounding the lawsuit caused him to seek treatment with a psychologist, Richard Rizzo, Ph.D., in July 2011. Dr. Rizzo diagnosed Jennings as suffering from post-traumatic stress disorder (PTSD) stemming from childhood sexual abuse. Jennings claims he informed Frank of his treatment and diagnosis of PTSD prior to April 11, 2012. However, he does not recall the date that he told Frank this information, nor does he remember any specific details that he discussed with Frank concerning his PTSD. If such a conversation in fact took place, Frank has no recollection of it.

*Marital Issues and April 10–11, 2012.* On April 5, 2012, Jennings and his wife separated, and Jennings began living at his mother's apartment. On April 10, Jennings and his wife went to a marriage counselor to discuss the couple's marital problems. After the counseling session, Jennings and his wife went back to the marital home and continued to discuss their issues. Jennings became more agitated because he was convinced that his wife wanted to return to her previous boyfriend. After drinking a pint of tequila and taking one of his mother's Xanax pills, he quickly became intoxicated. When he left around 11:15 p.m., his wife called a family friend, Bret Ansel of the Dundee Police, who knew of their ongoing marital problems. Jennings' wife again contacted Ansel around 3:15 a.m., indicating that

---

* The Honorable S. Thomas Anderson, United States District Judge for the Western District of Tennessee, sitting by designation.

Jennings was in his car in her driveway, texting her and wanting to come inside. When Ansel arrived, Jennings drove off. Ansel was in a private vehicle and did not pursue Jennings' car, believing it to be unsafe. Ansel communicated with Jennings through text messaging and became increasingly concerned that Jennings was going to take his own life. Ansel decided to involve Central Dispatch, and the Dundee Police Department was alerted. Officers were dispatched to join in the search for Jennings.

Around 5:00 a.m., Ansel located Jennings, who had driven to his mother's apartment. Having consumed a pint of tequila and Xanax, Jennings has no recollection of driving from the marital home to his mother's apartment. Ansel and another Dundee police officer woke Jennings to speak with him. Ansel then left. Jennings claims he knew at that time that he needed to seek professional help. He sent an email to Frank requesting three days off.

Frank was called around 5:45 a.m. and was informed that there was a potential issue with the Assistant Director. Frank then contacted Ansel, who told him that Jennings had been experiencing marital problems and "went off the deep end in a big way." R. 27–4, Frank Dep. Tr. at 3, Page ID 176. Ansel further explained that Jennings had made suicidal statements and had placed the barrel of a gun in his mouth.

After Ansel left Jennings at his mother's apartment, Jennings decided that he wanted to see his infant daughter, who was at his mother-in-law's house. He drove there, but his mother-in-law had been warned to prohibit him from coming inside. She called the Monroe County Sheriff's Department and Sergeant John Plath was dispatched to the house. Plath spoke to Jennings and then called Jennings' wife,

who recommended that Jennings admit himself to the University of Michigan Hospital. Jennings agreed and Plath transported him to the University of Michigan Hospital, where he was admitted for suicidal ideation.

*The Immediate Aftermath.* Frank emailed Jennings on April 13, 2012 to advise him that he was being placed on administrative leave and would be required to submit to a fitness-for-duty examination. Jennings responded the next day to inform Frank that he was doing much better and would be home by April 16. Once he was home on April 16, 2012, Jennings sent an email to Frank stating that he was released to do his normal activities. He acknowledged that he had received short-term disability paperwork from Frank, but stated that he did not see any need for it.

Jennings reported for his fitness-for-duty examination with Susan Casselman, Psy. D., in Toledo, Ohio. Her report to Armstrong begins, "At your request, Mr. Jennings was evaluated on 4/19/2012 to assess his fitness for duty. . . . Concerns arose recently due to an incident in which the client reportedly became intoxicated and made vague threats about suicide. At one point, he reportedly placed the barrel of a handgun into his mouth." R. 27–10, Casselman Report at 3, Page ID 208. She noted his history of PTSD but concluded that Jennings was not disabled.

Jennings saw Dr. Rizzo and told him that he felt ready to return to work but had not been cleared yet. Dr. Rizzo prepared a work leave of absence letter for Central Dispatch indicating that Jennings would be able to return to work on April 30, 2012 with no restrictions. Despite Dr. Casselman's recommendations as noted in her report, Jennings did not return to weekly treatment with Dr. Rizzo. Between April 28, 2012 and July 19, 2012,

Jennings saw Dr. Rizzo on three occasions and missed three appointments.

On May 8, 2012, Frank and Armstrong interviewed Jennings. At the meeting, Jennings admitted to drinking tequila and taking Xanax on April 10, 2012. He could not admit or deny driving while under the influence because he claimed that he had blacked out from 10:00 p.m. to 6:00 a.m. the following morning. The notes from the investigative interview indicate that the administration viewed his behavior on April 10–11, 2012 as serious and it was the reason that Jennings had been placed on administrative leave.

*The Central Dispatch Board Meeting.* On May 11, 2012, the Central Dispatch Board of Directors held a special meeting. At the meeting, Frank made a presentation recommending that Jennings' employment be terminated because he had a "lack of confidence and trust" in Jennings as Assistant Director. R. 27–2, Bd. Meeting Minutes at 2, Page ID 160; *see also R. 27–11,* Jennings Note at 3, Page ID 220. The Central Dispatch Board voted to accept Frank's recommendation and Jennings was terminated.

On June 11, 2012, Jennings wrote to Frank requesting a hearing to clear his name concerning the reasons that were given for his termination. On June 26, 2012, the Central Dispatch Board voted to deny Jennings' request.

*Procedural History.* Jennings filed suit against Monroe County, Central Dispatch, and the five members of Central Dispatch's Board of Directors who voted to terminate his employment—Tilman Crutchfield, Thomas Moore, Daniel Donahue, Robert Neely, and Larry Buckinham (collectively, "the County"). He asserted discrimination and retaliation claims under the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. § 12101 *et seq.,* as well as a § 1983 civil rights claim for the County's denial of his request for a name-clearing hearing. The County moved for summary judgment. After receiving briefs and holding a hearing, the district court granted the County's motion on November 25, 2014. Jennings appeals only the summary judgment ruling against his disability discrimination and civil rights claims.

## II

We review the district court's decision to grant a defendant's motion for summary judgment de novo. *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir.2009). Judgment may be affirmed only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). This court must look beyond the pleadings and assess the proof to determine whether there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Med Corp., Inc. v. City of Lima,* 296 F.3d 404, 408 (6th Cir.2002). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In conducting the summary judgment analysis, this court must view all inferences to be drawn from the underlying facts in the light most favorable to the nonmoving par-

ty. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348.

## III

The Americans with Disabilities Act (ADA) provides that no covered entity shall discriminate against a qualified individual on the basis of a disability. 42 U.S.C. § 12112(a). A plaintiff claiming discrimination under the ADA must first establish a *prima facie* case. *Monette v. Elect. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir.1996) (abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir.2012) (en banc)). The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. *Id.* Finally, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but rather were a pretext for discrimination. *Id.* Summary judgment was proper here because Jennings failed to bring forward sufficient evidence to show that the County's proffered reason for termination was pretextual.

*The Proffered Reason.* The Central Dispatch Board met on May 11, 2012. During this meeting, Frank made a presentation recommending that Jennings' employment be terminated because Frank no longer had confidence in his second-in-command. In his deposition, Frank clarified his reasons for recommending termination:

> Th[e April 10–11, 2012] incident, in investigating that incident, learning that he had drank intoxicants, learning he had taken medication not prescribed to him, learning that he had drove an automobile after duty in a manner that was excessive in prompting a police officer not to be able to keep up with him, and knowing that he had no recall from 9 in the morning, or from 9 in the evening, limited recall I believe is what he said, from 9 in the evening until 6:30 in the morning, and yet it's his responsibility to be here and on call and available for managerial duties, for county emergencies, those decisions, or those facts, ... prompted my decision....

R. 33–2, Frank Dep. Tr. at 18, Page ID 309.

■ A plaintiff can show pretext by showing that the defendant's proffered reason for termination has "no basis in fact," "did not actually motivate the employer's action," or was "insufficient to motivate the employer's action." *Chen*, 580 F.3d at 400; *see also Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.2000). Here, Jennings alleges that it was his disability that motivated the County to terminate his employment. Jennings raises two arguments in support of this: (1) Jennings' behavior on April 10–11, 2012 was a direct result of his PTSD and (2) the County's credibility has been called into question because the County ignored Dr. Casselman's recommendations and because of conflicting evidence about the timing of the decision to terminate. Jennings fails to bring forward sufficient evidence to defeat summary judgment on either argument.

*Behavior as a Direct Result of PTSD.* Jennings characterizes the difference between terminating him for his behavior on April 10 and 11 and terminating him for his PTSD as a "very fine distinction." Reply Br. 6. Fine it may be, but a distinction it remains. As Jennings himself acknowledges, "[his] PTSD does not immunize his behaviors from disciplinary action." Appellant Br. 26.

Jennings must show that the proffered reason for discharge was a pretext intended to hide unlawful discrimination. *Monette*, 90 F.3d at 1186; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 146–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (noting that while "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," "[t]he ultimate question is whether the employer intentionally discriminated"). Jennings has not provided adequate evidence that the County knew of any causal connection between Jennings' history of PTSD and his behavior on April 10–11, 2012. Jennings states that there is "abundant evidence in the record suggesting that Jennings' behavior was caused by his PTSD." Appellant Br. 22. The record—including Jennings' record citations—does not support his claim. Sergeant Ansel told Frank, "I don't know if you know what is going on, but there has been *family issues with Jeremy and his wife* and tonight he went off the deep end in a big way." R. 33–2, Frank Dep. Tr. at 8, Page ID 299 (emphasis added). At Jennings' admission to the hospital his doctor described his PTSD as *"subclinical,"* R. 27–9 at 2, Page ID 204 (emphasis added), and at his discharge his doctors had *not* diagnosed him with PTSD, R. 33–9 at 3, Page ID 424 (listing PTSD as a *comorbidity* and *not* a principal or secondary diagnosis of his current hospital stay). Although Dr. Casselman noted that "[i]n many ways, this incident does appear to be … caused in part by recent recollections of sexual and physical abuse, and a history of low self-esteem," she concluded that *"I do not see Mr. Jennings as disabled."* R. 27–7 at 6, Page ID 197 (emphasis added). Without more, simply knowing of his history of PTSD and knowing of his actions on April 10 and 11 is not enough to avoid summary judgment.

Even if Jennings' behavior on April 10–11, 2012 was a result of his PTSD, our precedent states that "an employer may legitimately fire an employee for conduct, even conduct that occurs as a result of a disability, if that conduct disqualifies the employee from his or her job." *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir.2007) (abrogated on other grounds by *Lewis*, 681 F.3d 312); *see also Brohm v. JH Props., Inc.*, 149 F.3d 517, 521 (6th Cir.1998). In *Maddox v. University of Tennessee*, we found that the University of Tennessee discharged the plaintiff for unacceptable conduct (i.e., driving while intoxicated) rather than his disability (i.e., alcoholism) and thus did not engage in disability discrimination. 62 F.3d 843, 847 (6th Cir.1995) (abrogated on other grounds by *Lewis*, 681 F.3d 312). As an employee of Central Dispatch, Jennings was required to follow the Code of Conduct, which states in relevant part:

3. Employees shall not be participants in any incident involving moral turpitude that causes Monroe County Central Dispatch to be brought into disrepute, impairs the efficiency of Monroe County Central Dispatch, or impairs their ability to properly perform their duties. . . .

10. Employees shall not possess or consume any kind of intoxicating beverage while on duty. Off duty, members shall not use intoxicants to the extent that any evidence of such consumption is apparent when reporting for scheduled duty.

R. 27–19, Code of Conduct at 2–3, Page ID 247–48. As Assistant Director, Jennings was on-call in case there were any employee or equipment issues or an emergency situation. On the night of April 10, 2012, he consumed a pint of tequila and took a pill of Xanax that was not prescribed to him. When Ansel spoke to Jennings around 5:00 a.m., he had no recollection of driving from his wife's home to his mother's apartment around 3:15 a.m. Jennings' actions are what led Frank to recommend

his termination; his judgment was impugned because of his misconduct. Thus, the County could terminate Jennings even if his misconduct was caused by his disability.

*Credibility.* Jennings condemns the County for not firing him immediately after April 11, 2012. He attempts to somehow claim that because they waited until the results of a fitness-for-duty examination, they must have fired him for his disability—even though the conclusion of that fitness-for-duty examination was that Jennings was not disabled. Jennings argues that the County "ordered a fitness for duty examination and then ignored its recommendation." Appellant Br. 25. When one reads Dr. Casselman's report, however, this argument is entirely unpersuasive. Dr. Casselman evaluated Jennings and concluded that he was not disabled. She went on to make a few recommendations to smooth Jennings' transition back to work—not because she believed such accommodations were necessary for any disability (again, she did not believe Jennings was disabled), but because she had concerns about how his behavior on April 10 and 11 would impact his relationships with his coworkers. She reported that "[p]erhaps most striking of all, throughout the interview process, was Mr. Jennings' lack of insight regarding the possible ramifications of the incident that took place" and that Jennings "stated he did not feel that it would undermine his authority in any way." R. 27–7 at 5–6, Casselman Report, Page ID 196–97. She then recommended that "Mr. Jennings should be on administrative leave for at least a month ... to give co-workers a chance to put this in perspective." *Id.* at 6, Page ID 197. The County's credibility is not called into question because they waited to terminate Jennings until receiving the results of a fitness-for-duty examination.

Jennings next points to an email dated April 17, 2012 from Tilman Crutchfield, Chairman of the Central Dispatch Board, to Aundrea Armstrong, the Deputy Director of Human Resources for Monroe County, to support his claim that there is circumstantial evidence calling into question Frank's and Crutchfield's credibility such that a jury could conclude that they were lying about their non-discriminatory reason for terminating him. Crutchfield's email states:

> Myself and Director Frank are of the same opinion that JJ can not be allowed to return to his position. Some other provision must be made to either reach a settlement agreement or find another position in county govt.... [I] agree that it must be handled in steps but at the same time Al can not be expected to run Dispatch without an assistant.... [S]ome provision must be made in the interim.

R. 33–10, Crutchfield–Armstrong Email at 3–4, Page ID 432–33. This email is not the smoking gun Jennings purports it to be. Jennings compares this email to Frank's and Crutchfield's depositions, but the email and their testimony do not contradict each other. In his deposition, Frank said that the decision to terminate Jennings' employment was made on May 11, but when asked when he decided to recommend termination he stated:

> I was not comfortable, from the time that this incident occurred, that Jeremy could return in the capacity of the second in command of central dispatch. However, I was not—there could be a number of factors. That decision, in my mind, was not complete until after we had received Dr. Casselman's report ... [b]ecause, if in fact he had some type of disability that I didn't know about, then that's a totally different look. Otherwise it's a matter of his own personal

discipline, his judgments, and the decisions that he made, conscious and in harmony with his job responsibilities. R. 33–2, Frank Dep. Tr. at 16, Page ID 307. Crutchfield admitted to a discussion with Frank regarding Jennings in which Frank said that he no longer had confidence in Jennings. He knew this discussion occurred after the incident and before the board meeting's agenda was created, but did not recall the exact time frame. Despite Jennings' contrary characterization that "[t]heir failure to honestly admit that they immediately intended to terminate Jennings' employment" calls their credibility into question, Appellant Br. 25–26, this email does not provide evidence that the jury could accept as a reason for rejecting the County's proffered reason for termination.

Moreover, this minor possible timing issue does not have any bearing on the County's proffered reason for termination—Jennings' behavior on April 10 and 11, 2012. Jennings argues that because of this perceived contradiction—a contradiction that *does not* undermine the County's proffered reason for termination—the jury could disbelieve the County's proffered reason. This argument puts far too much weight on such a trivial inconsistency. Although it is true that an employer's motive "is one rarely susceptible to resolution at the summary judgment stage," *Ross v. Campbell Soup Co.,* 237 F.3d 701, 706 (6th Cir.2001), it does not follow that an ADA discrimination claim can *never* be subject to summary judgment. A reasonable jury could not find that Jennings had shown by a preponderance of the evidence that the reason for termination proffered by the County was merely pretext for unlawful disability-based discrimination based only on this email. Because sufficient evidence has not been provided such that a reasonable jury could return a verdict for Jennings, summary judgment was properly granted below.

## IV

The Fourteenth Amendment Due Process Clause protects "a person's reputation, good name, honor, and integrity." *Chilingirian v. Boris,* 882 F.2d 200, 205 (6th Cir.1989). A deprivation of any of these liberty interests must be accompanied by notice and an opportunity to be heard to refute any charges against that person. *Id.* In order to show that he was deprived of such an interest, a plaintiff must establish that: (1) the stigmatizing statements were made in conjunction with his termination from employment; (2) the employer's statements alleged more than improper or inadequate performance, incompetence, neglect of duty, or malfeasance; (3) the statements were made publicly; (4) he claimed that the charges made against him were false; and (5) the public dissemination of the statements was voluntary. *Ludwig v. Bd. of Trs. of Ferris State Univ.,* 123 F.3d 404, 410 (6th Cir. 1997); *see also Brown v. City of Niota,* 214 F.3d 718, 722 (6th Cir.2000). The parties here contest only two of these elements: whether Director Frank's statement to the Central Dispatch Board that he had a "lack of confidence and trust" in Jennings was stigmatizing, and whether Jennings claimed that the charge made against him was false.

### A

■ Frank's statement that he had a "lack and confidence and trust" in Jennings was not of such a disparaging or defamatory nature as to implicate the protections of the Due Process Clause. Jennings must demonstrate that the statements made at his discharge "might seriously damage his standing and associ-

ations in his community" or might "impose[ ] on him a stigma or other disability that [would] foreclose[ ] his freedom to take advantage of other employment opportunities." *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Ludwig,* 123 F.3d at 410. However, a statement that "merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation." *Joelson v. United States,* 86 F.3d 1413, 1420–21 (6th Cir.1996); *see also Chilingirian,* 882 F.2d at 205 n. 8.

Jennings speculates that Frank's statement "destroyed [Jennings'] ability to work in the public safety field" and it was a "kiss of death to [his] career" in the field of public safety. Reply Br. 8. Other than these statements, he offers no evidentiary support for his assertion. Such speculation, however, is insufficient to defeat summary judgment. A party cannot defeat summary judgment with "[c]onclusory allegations, speculation, and unsubstantiated assertions." *Gooden v. City of Memphis Police Dep't,* 67 Fed.Appx. 893, 894 (6th Cir.2003) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)); *see also Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

Even viewing the evidence in the light most favorable to the plaintiff, Jennings has failed to establish that the general remark that the Director lacked trust and confidence in him was stigmatizing. *See Lake Mich. Coll. Fed'n of Teachers v. Lake Mich. Cmty. Coll.,* 518 F.2d 1091, 1097 (6th Cir.1975) (noting that the requisite stigma requires a charge of mental illness, fraud, untruthfulness, or the like). Moreover, nothing in our precedent indicates that such a nondescript statement rises above a charge of improper or inadequate performance, incompetence, neglect of duty, or

malfeasance to constitute stigma in the constitutional sense. For example, we did not find stigma when an administrator at a non-profit was terminated because there " 'were some recurring problems with the management of the grant' " as well as " 'some basic policies that weren't being followed.' " *Bessent v. Dyserburg State Cmty. Coll.,* 224 Fed.Appx. 476, 480 (6th Cir.2007). Despite the employee's claims in that case that "several friends contacted her and said that it sounded like she had stolen money," we held that such comments imposed no stigma of dishonesty or immorality, but rather spoke only of inadequate job performance. *Id.* at 481. Nor did we find stigma in *Blair v. Board of Regents of State University and Community College of Tennessee,* when a teacher was not rehired because his employer "believe[d] his professional relationships with individual students frequently fail[ed] to meet minimum standards." 496 F.2d 322, 324 (6th Cir.1974). If such a statement is not a 'kiss of death' for a teacher, it is hard to see how a director's "lack of confidence and trust" in his assistant director would foreclose all other employment opportunities. *See also Lake Mich. Coll. Fed'n of Teachers,* 518 F.2d 1091 (holding that accusations of criminality are not *per se* stigmatizing and finding teachers had not suffered any stigma even when they were terminated after accusations of violating Michigan's no-strike law). Unsurprisingly, when Frank recommended that Jennings be terminated, he made a statement about Jennings that was not positive. A "lack of confidence and trust," however, is not of such a defamatory nature as to trigger constitutional protection.

**B**

Further undermining his argument, Jennings cannot claim that Frank's statement at the Central Dispatch Board

meeting was false. In fact, Jennings fails to mention this issue on appeal despite the district court's alternative holding on this issue. An employer must have created "a *false* and *defamatory* impression about the employee" to implicate the right to a name-clearing hearing. *Codd v. Velger,* 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (emphasis added); *see also Quinn v. Shirey,* 293 F.3d 315, 320 (6th Cir.2002). The remedy for a denial of his liberty interest without due process of law is an opportunity to be heard to refute the charges made against him. *Ludwig,* 123 F.3d at 410. "If he does not challenge the substantial truth of the material in question, no hearing would afford a promise of achieving that result for him." *Velger,* 429 U.S. at 627–28, 97 S.Ct. 882 (1977).

The only statement Frank made during the Central Dispatch Board meeting was that he had a "lack of confidence and trust" in Jennings and so recommended that Jennings be terminated. Jennings has never claimed that Frank in fact *did* have trust and confidence in him. In light of his ADA claims, Jennings' arguments for a name-clearing hearing can perhaps be more favorably read to say that Frank's stated reason for terminating him were not his *true* reasons. Even with this gloss on his arguments, however, Jennings would not have met this element. The point of a name-clearing hearing is *not* to argue over the reasons for termination. Rather, the point is to give the employee the opportunity to argue, "You made a statement about me that is ruining my reputation, and that statement is not true." *Compare Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (holding that the deprivation of a *property* interest in retaining employment required a hearing at which the employee could present his side of the facts and argue that he should not be terminated) *with Quinn,* 293 F.3d at 321 (noting that the deprivation of a *liberty* interest required a name-clearing hearing to provide the employee the opportunity to refute the statements made against him) *and Ludwig,* 123 F.3d at 410 (same). Even if this one statement did not reflect Frank's *entire* reason for recommending Jennings' termination, Jennings does not and cannot reasonably claim that Frank's statement was false.

\* \* \*

Jennings has not created a genuinely disputed issue that the County's proffered nondiscriminatory reason for termination was pretextual, nor has he shown that Frank's statement to the Central Dispatch Board was stigmatizing and false. Accordingly, we AFFIRM the judgment of the district court.