*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0328p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

SHOW ANN CHEN,

*Plaintiff-Appellant,*

v.

No. 08-1597

DOW CHEMICAL COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-10275—Paul D. Borman, District Judge.

Argued: June 11, 2009

Decided and Filed: September 8, 2009

Before: MARTIN and KETHLEDGE, Circuit Judges; WATSON, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Bryan L. Monaghan, LAW OFFICE OF BRYAN MONAGHAN, Rochester, Michigan, for Appellant. Edward J. Bardelli, WARNER, NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Bryan L. Monaghan, LAW OFFICE OF BRYAN MONAGHAN, Rochester, Michigan, for Appellant. Edward J. Bardelli, Amanda M. Fielder, Matthew T. Nelson, WARNER, NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellee.

_____

**OPINION**

_____

BOYCE F. MARTIN, JR., Circuit Judge. Plaintiff Show Ann Chen appeals the district court's grant of summary judgment for defendant Dow Chemical in this Title VII suit. Chen alleges that Dow fired her either because of her race or to retaliate against her

_____

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

for engaging in activity protected by Title VII. Dow contends that it terminated Chen for poor performance. Because Chen has failed to create a genuine issue of material fact as to whether Dow's explanation was a pretext for an illegal motive, we AFFIRM.

I.

Plaintiff Show Ann Chen is a fifty-nine year-old Asian-American immigrant from Taiwan. In 1998, she obtained work in Dow Chemical's automotive group in Auburn Hills, Michigan as a "receivable specialist," which involves managing accounts with vendors and collecting payments. She received positive reviews during her time at Auburn Hills.

In September 2004, Dow transferred its entire automotive group to its headquarters in Midland, Michigan as part of a company-wide reorganization. Receivables specialists at Midland had different responsibilities than at Auburn Hills. Instead of handling their own accounts, receivables specialists worked in pairs, with one person handling account discrepancy work and one handling collections work. They also shared responsibility for accounts with superiors, and had to "escalate" significantly overdue accounts up the chain of command. These duties were implemented by a standardized work process, which was mandatory for all employees.

At Midland, Chen was paired with Mary Van Tol, who had also been transferred from Auburn Hills. Chen was assigned the collection work for the pair. R.O.A. 408-09. Their supervisor was Brenda Baker. Chen was the only Asian-American under Baker's supervision.

By all accounts, Chen had difficulty with the transition to Midland. She preferred the account management procedures she had used at Auburn Hills, and she either failed to learn or declined to follow the new ones. Instead, she managed due dates and account data spreadsheets manually, and did not refer past due accounts to her superiors. Chen also attempted to retain control over the discrepancy work of certain accounts she used to manage, which created tension between Chen and her "teammate," Van Tol.

In May 2005, Dow performed a randomly-assigned sales adjustment audit of Chen's work, and found three major deficiencies. First, Chen was not bringing delinquent accounts to the attention of the appropriate Dow salesperson on time. Second, Chen was using a "blanket approval" code approved only for GM for all her customers. Third Chen was not properly logging information into Dow's systems; she was using manual spreadsheets like she had in Auburn Hills. R.O.A. 61-63. These deficiencies, Baker later explained, were "fundamental issues that every Receivable Specialist should know how to do correctly." R.O.A. 187.

To remedy the shortcomings identified in the audit, Baker met with Chen, scheduled additional training sessions, instructed her co-workers to help her learn the system, and held bi-weekly meetings to monitor her progress. R.O.A. 61-63, 187. These meetings continued through the Fall, when Baker encouraged Chen to utilize Dow's "work process coach" to improve the efficiency and accuracy of her sales adjustments and to work on prioritizing her time. R.O.A. 79. Chen tried the techniques Baker recommended, but soon reverted back to her own. R.O.A. 300.

In addition to her difficulties in adjusting to the work procedures at Midland, Chen also struggled to fit in socially. Both coworkers and customers found her combative, and she was involved in a number of interpersonal conflicts that came to the attention of Dow management. In July 2005, for instance, Chen and Van Tol had a heated confrontation after Chen attempted to work on accounts assigned to Van Tol. R.O.A. 76. Chen claimed Van Tol was doing the work incorrectly. Baker then sat down with Chen and Van Tol to clarify their duties. R.O.A. 76-77. She also met separately with Chen to discuss her interpersonal skills. Later that month, Baker received a customer complaint about Chen's manner in handling a stop payment request. Baker told Chen to stop contacting the customer. R.O.A. 78. In the Fall, Baker was forced to meet with Chen again after another customer complained about Chen's confrontational collection tactics. She also spoke with Chen about her peer review of Van Tol, who Chen referred to as "a typical American that has no patience for details." R.O.A. 79.

Baker gave Chen a negative performance review for 2005, explaining that while Chen obtained good collection results, her methods needed improvement. R.O.A. 65-71. Chen was still failing to follow the Midland work process, and failing to work effectively with customers and co-workers. Chen requested a meeting with Baker to discuss her evaluation, which she felt should have been better. Baker told her she needed to accept responsibility for her past and move forward. R.O.A. 80. Chen, however, refused to drop the issue and raised it with Baker's supervisor, explaining that she and Baker "did not agree with the method used to collect the money." R.O.A. 87. Baker later received an email Chen sent to a colleague complaining that Baker had less experience, did not treat her fairly, and that Baker's methods did not work. R.O.A. 80.

In April 2006, Dow placed Chen on a "Performance Improvement Plan," and gave her an ultimatum: either perform at a satisfactory level or face termination. R.O.A. 464-67. The plan recommended improvement in four areas: (1) "Work Process Effectiveness"; (2) "Systems & Technology"; (3) "Teamwork"; and (4) "Interpersonal Effectiveness." R.O.A. 464-66.

In the weeks that followed, Baker met with Chen to clarify her responsibilities and to discuss the results of a second performance audit. Chen's performance had improved but remained unsatisfactory. R.O.A. 81. In her review, Baker noted the following: (1) Chen needed to focus upon standard written procedures and the work process coach; (2) one of Chen's customers refused to work with her any longer, saying her phone calls were coming across like a "collections" agency; and (3) Chen needed to improve communication and teamwork. R.O.A. 81-82. A short time later, Baker asked Laura Shibilski, one of Chen's co-workers, to meet with Chen weekly to coach her on mandatory procedures. R.O.A. 237; *see also* R.O.A. 97, 102-03.

During this time, Chen continued to dispute Baker's assessment of her performance—first informally, in their meetings, and then in writing. On May 14, Chen wrote Baker a lengthy letter stating that she felt she was being held to a higher standard than others, and asking Baker to revise her 2005 performance review. R.O.A. 675-77. In the letter Chen stated: "My leader has not heard my voice. . . . I was not given a

human right opportunity." R.O.A. 675. She did not mention race or discrimination. Baker met with Chen the following week to address her concerns.

On May 31, Baker sent Chen a letter informing her that her performance had not improved and that the failure to immediately improve would result in her termination. R.O.A. 94. The next day, Laura Shibilski, who had been assigned to tutor Chen on work processes, reported that Chen had "abandoned most of the work process" and was "working inefficiently without explanation." R.O.A 102-03. She was frustrated that Chen had failed to implement any of her suggestions even though she had gone over them a number of times. R.O.A. 102-03, 626. In a subsequent email, Shibilski complained to Baker that Chen "keeps people out of the loop," makes "inefficient use of [her] time," showed "no ownership, responsibility, [or] accountability," was "competitive," and engaged in "inappropriate and unprofessional behavior." R.O.A. 73-74. Later that day, Sarah Kok, a human resources lead, met with Chen to discuss her performance shortfalls and their potential consequences. Chen said she did not intend to change her methods because Baker did not understand the work. R.O.A. 647.

A few days later, Chen told Shibilski she felt she was being treated more harshly than her peers because of her "age and different culture." R.O.A. 97. Shibilski notified Baker, who forwarded the matter to Kok. Kok then sat down with Chen to discuss her comments and review Dow's "Code of Business Conduct." At the end of this meeting Chen recanted her comments to Shibilski. Kok subsequently sent Chen a letter confirming this in writing, and reiterating to Chen that she had to show "substantial improvement" in order to keep her job. R.O.A. 105.

On June 14, Chen reversed course, sending Kok an email stating that she believed she was being treated unfairly because of her race because she had not been allowed to switch teammates when others had.[1] R.O.A. 107. The same day, Chen placed two calls to Dow's anonymous ethics hotline. R.O.A. 110-14. She alleged that Baker "show[ed] preferential treatment to the employees she likes" and unfairly

---

[1]Baker contends she does not switch teammates because of personality conflicts. R.O.A. 189, 376-77, 532, 535-37.

reprimands employees she does not like "when they don't use the procedures she prefers." In the second call, Chen alleged that Baker "immediately writes off monies that should be collected without making an effort to collect the funds," and demanded that Dow interview her coworkers about Baker's "abuse of power." Neither call to the ethics line mentioned discrimination or race.

Chen's complaints were referred to Patricia McDonald, Dow's "Diversity Compliance Implementation Leader." R.O.A. 226. McDonald interviewed Chen, who stated that Baker wrongly criticized her performance because of her race, that Baker gave preferential treatment to Caucasian employees, and that Baker refused to switch her teammate, although others were permitted to switch. R.O.A. 119-123, 578-80. McDonald then interviewed Chen's coworkers about these allegations. R.O.A. 116-25; 530-33, 538-43. Finding no support for Chen's claims, McDonald filed a report dismissing Chen's complaints as "unsubstantiated." R.O.A. 116-17.

On July 12, Baker sent Chen a letter indicating that she would be terminated unless her performance substantially improved.[2] R.O.A. 130. The letter set a deadline of August 7, when her file was to be reviewed by an Employee Review Board, Dow's internal mechanism for making employment decisions. On July 20, Baker sent Chen an email indicating that she still perceived significant gaps in her performance. R.O.A. 485.

On August 7, the Employee Review Board—comprised of Baker, Kok, McDonald, Jennifer Manchester (legal department), and Bob Meikle (a neutral manager)—elected to terminate Chen's employment, citing continuing performance deficiencies in (1) "Teamwork," (2) "Interpersonal Effectiveness," (3) "Work Process," and (4) "Systems & Technology." These were the same areas identified for improvement in her 2005 review and in her 2006 performance improvement plan. R.O.A. 132-33.

---

[2]On July 10, Kristi Feinhauser formally took Baker's position, but Baker stayed on during the transitional period. R.O.A 638.

On August 9, Chen's attorney notified McDonald that Chen had filed an EEOC charge.[3] Chen obtained a right to sue letter from the EEOC, and filed suit against Dow in the Eastern District of Michigan. She alleged discrimination and retaliation under Title VII, as well as a violation of Michigan's civil rights act, and a claim for intentional infliction of emotional distress. The district court granted summary judgment for Dow on her Title VII claims. It rejected her discrimination claim because it found that Dow had offered non-discriminatory grounds to fire her and that Chen had failed to bring forward sufficient evidence of pretext to rebut this finding. The court rejected Chen's retaliation claim on the ground that her May 14 memo to Baker was not a protected complaint of discrimination. The court then declined to exercise supplemental jurisdiction over Chen's state law claims and dismissed them without prejudice. R.O.A. 726. Chen now appeals.

## II.

We review a grant of summary judgment de novo. Summary judgment is proper only if no genuine issue of material fact remains in dispute and the movant is entitled to judgment as a matter of law. *Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).

### 1.  Race Discrimination Claim

A plaintiff may prove that she was subject to disparate treatment based on race in violation of Title VII using either direct or circumstantial evidence. Where, as here, there is no direct evidence of discrimination, the plaintiff's circumstantial evidence is analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). The burden is first on the plaintiff to demonstrate a prima facie case of race discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden

---

[3] Chen filed the charge on July 31, but Dow did not learn of it until after it decided to end Chen's employment.

shifts back to the plaintiff to show pretext—i.e. that the employer's explanation was fabricated to conceal an illegal motive. *Id.*

Here, the parties dispute only the issue of pretext. Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action.[4]  *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004). To carry her burden in opposing summary judgment, Chen must produce sufficient evidence from which a jury could reasonably reject Dow's explanation of why it fired her. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 526 (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir.2001)).

Chen's first argument is that Dow's reason for terminating her lacks a basis in fact because her performance was actually up to Dow's standards. We do not share Chen's view of the record. But even if Chen can show that Dow erred in its assessment of her performance, Dow can rebut any inference of pretext that might arise from it. When an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be "mistaken, foolish, trivial, or baseless." *See Clay*, 501

---

[4]Because this three-part test has recently been the subject of some potent criticism, *see Forrester v. Rauland-Borg Corp.*, 453 F.3d 416 (7th Cir. 2006),  we pause to note that it is important to avoid formalism in its application, lest one lose the forest for the trees. Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is. One can distill the inquiry into a number of component parts, and it can be useful to do so. But that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."); *Forrester*, 453 F.3d at 417 ("If [the proffered reason] is not the true ground, the employer may still be innocent of discrimination; he may for example have lied to conceal a reason that was discreditable but not discriminatory.") (citations omitted). At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial. *Hicks*, 509 U.S. at 511. But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000) ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

F.3d at 713-15.  And here, the evidence Dow had at hand when it fired her in August 2006 indicated that Chen's work was not up to par.  In addition to numerous informal reports from coworkers, Chen had an eighteen-month history of performance problems, including two failed performance audits, a negative review for 2005, and a history of customer complaints and conflicts with coworkers.  Even judging from the time Chen was put on a Performance Improvement Plan in April 2006, Dow had evidence of ongoing performance problems in the months that followed more than sufficient to trigger the honest belief rule.  Laura Shibilski, who was assigned to tutor Chen on Dow's work process, reported to Baker on several occasions that Chen was either unable or unwilling to follow mandatory procedures.  This was corroborated by Chen's comments to Kok in early June, and by Baker's observations from April until Chen's termination in August.  Shibilski also reported that Chen was "competitive," that she continued to display "inappropriate and unprofessional behavior," and that "folks sh[ied] away" from working with her as a result.  R.O.A. 73-74.  Absent a reason to doubt the validity of these reports, Dow was entitled to rely on this information in deciding to terminate Chen's employment and acted reasonably in doing so.[5]

Chen's second argument is that the decision to terminate her had already been made in early June.  Based upon this, Chen argues, a jury could reasonably find it was "more likely than not" that Dow did not actually fire Chen because of her performance, but because of her race.  *Madden v. Chattanooga City Wide Serv. Dept.*, 549 F.3d 666, 676 (6th Cir. 2008) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)).  We disagree.  On this record, no reasonable jury could find that it was "more likely than not" that Chen's performance was a pretext for an illegal motive.

Chen's sole piece of evidence in support of this theory is a June 2, 2006 email from Kok to Baker stating that she was "thinking of requesting severance."  R.O.A. 647.

---

[5]Chen emphasizes that she did all of the additional training Dow asked, but this sheds  little light on whether the training had any effect on her performance, or whether she ultimately met Dow's standards.  Chen's emails to Baker recounting her compliance efforts, R.O.A. 469-87, are relevant to this question, but, to the extent they support her claim, they are not sufficient to render Dow's belief unreasonable in the face of evidence from multiple sources that Chen was not meeting expectations.

But evidence that the termination process was in motion by June does not show it could not be reversed, nor does it show that a final decision had been made. R.O.A. 367. More fundamentally, however, even if Chen can show the decision to terminate her was made in June, it does not follow that Dow's reason—unsatisfactory performance—was pretextual. Indeed, unsatisfactory performance is the only explanation for Chen's termination that is supported by the record. By early June 2006, Dow had observed performance problems on Chen's part for over a year and had attempted to correct them to little or no avail. The areas Dow identified for improvement—Teamwork, Interpersonal Effectiveness, Work Process, and Systems & Technology Effectiveness, R.O.A. 132—remained the same from May 2005 until her August 2006 termination, and Dow documented shortcomings in these areas throughout that period of time. Even judging from when Chen was put on a Performance Improvement Plan in April 2006, Dow had ample evidence that Chen failed to perform up to expectations in the months that followed. This backdrop provides strong support for Dow's claim that it fired Chen for performance-related reasons, and Chen has offered scant evidence to discredit Dow's explanation.[6]

Because Chen has not produced evidence from which a reasonable factfinder could doubt that she was fired for performance-related reasons, summary judgment was appropriate on her disparate treatment claim. *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 504 (6th Cir. 2007) ("As the Supreme Court noted in *Reeves*, summary judgment is appropriate, as in this case, if the plaintiff 'only created a weak issue of fact as to whether the defendant's reason was untrue' and there is ample evidence to support the employer's position.") (quoting *Reeves*, 520 U.S. at 148).

---

[6]To the extent Chen claims that her negative review and subsequent placement on a Performance Improvement Plan are themselves evidence of discrimination, this claim is not supported by the record. It is true that Chen's "teammate," Van Tol, had some performance issues in 2005 and did not receive a negative review. But Van Tol's performance record in 2005 was materially different from Chen's. There is no evidence in the record that Van Tol failed a performance audit, or insisted on using her own methods in spite of instructions to the contrary and extensive supplemental training. Nor is there evidence she had problems getting along with her coworkers or was the subject of repeated customer complaints. On the contrary, Van Tol received good marks for her "interpersonal effectiveness" and "teamwork" on her 2005 review, with "Needs Development" in technical areas only. R.O.A. 445.

## 2. *Retaliation Claim*

We turn next to Chen's retaliation claim.    Like Title VII intentional discrimination claims which lack direct evidence of discrimination, retaliation claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden shifting framework.    *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009).

We need not address whether Chen established a prima facie case of retaliation, because she has failed to create a genuine issue of material fact as to pretext.    *Cf. Ladd*, 552 F.3d at 502.    As explained above, the evidence overwhelmingly supports Dow's claim that it terminated Chen for performance-related reasons.    On this record, no reasonable jury could conclude otherwise.    Accordingly, Dow is entitled to summary judgment on Chen's retaliation claim as well.    *Abdulnour*, 502 F.3d at 504.

### III.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Dow Chemical.