NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0285n.06

Case No. 22-3884

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 20, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ZA'KARI DIJON, | ) | |
| Plaintiff - Appellant, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| CENTRAL OHIO TRANSIT AUTHORITY, | ) | OPINION |
| Defendant - Appellee. | ) ) | |

Before: BOGGS, GIBBONS, and McKEAGUE, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Following her termination, Za'Kari Dijon sued her former employer, Central Ohio Transit Authority ("COTA"), alleging unlawful sex discrimination and retaliation under Title VII. Dijon appeals the district court's grant of summary judgment to COTA on her sex discrimination claim. Because Dijon fails to establish that COTA's stated reason for her termination—violation of the COTA attendance policy—was pretextual, we affirm.

I.

On September 16, 2019, Za'Kari Dijon began working at COTA as a student bus operator. Dijon was assigned male at birth but now identifies as a transgender woman. As an employment requirement, Dijon had to provide COTA with her Commercial Driver's License ("CDL") and a Department of Transportation medical card. Her CDL at that time identified Dijon's sex as male, but her medical card identified her as female.

Because Dijon had a CDL, she began her employment by participating in COTA's fast-track, nine-week training program for student bus operators. Dijon's training involved classroom work and actual bus driving. Todd Kegler was Dijon's classroom trainer, responsible for checking in students each day and distributing COTA's policies. Leslie Wilks was her road trainer. Harvey Richardson was the Superintendent and Manager of Transportation Training.

On the second day of the program, Kegler distributed the Student Operator Attendance Policy to his students. The policy requires students "to report to work on-time for both classroom instruction and driving. This includes: start-of-day . . . [.] Tardiness of even one minute is not acceptable and *can* disqualify you from employment with COTA." DE 21-2, Student Operator Attendance Policy, Page ID 422 (emphasis at original). Further, the policy explains that, "[i]f you are sick and unable to report to work, you *must* call the Division Supervisor at least one hour before your scheduled report time. If you do not call one hour prior to the scheduled report time, you can be disqualified from employment with COTA." *Id.* (emphasis at original). Finally, the policy warns employees that two days of absence "will disqualify you from the current training class." *Id.* Absences were qualified as "no-shows or [being] late." DE 23-1, Richardson Dep., Page ID 846. Kegler also explained to the class that attendance issues could be excused if students provide documentation, such as a doctor's note, upon their return to work. Dijon confirmed that Kegler explained the policy as he was handing it out. Dijon signed the policy on her second day of employment.

Three days into her employment, Dijon alleges that she was on the bus with several classmates and Wilks when she overheard Wilks making offensive comments about transgender individuals. She recounted that Wilks "went on and on about" how "some people . . . give

. . . [their] ovaries . . . [their] woman parts to trans women so they can have kids . . . that's just disgusting, and that's not what God intended." DE 21, Dijon Dep., Page ID 248.

Dijon did not comment on or engage in that conversation on the bus, but later that day she went to speak with Kegler. Without indicating the person about whom she was talking or the content of the conversation, Dijon asked Kegler how she could "report someone pushing their agenda on [others]" and inquired about how long the bus tapes were available. DE 22-1, Kegler Dep., Page ID 490. Although Dijon did not specify the situation or person at issue, Kegler was aware that Dijon was referring to a supervisor. Kegler informed Dijon that she could file a complaint with him, which he would take to Richardson, his boss, or she could go directly to Richardson. Dijon responded that "nothing will happen anyway," to which Kegler countered that COTA had steps to address any issues. *Id.* at Page ID 492. Dijon did not file a complaint or otherwise take action. However, Kegler did tell Richardson what Dijon had asked him and questioned whether something had occurred on the bus that day. Kegler asked Wilks and another manager, Frank Burgess, the same question but did not follow up on the matter further.

The following week, Dijon arrived late to training on two separate occasions. The times of classes depended on bus availability, so they varied each week. On September 23, training was scheduled to begin at 5:00 a.m., but Dijon did not arrive until 5:20 a.m. Upon her arrival, Dijon explained to Kegler that she believed class began at 5:30 a.m. Kegler documented her tardiness on a Performance Counseling & Discipline form. The next morning, Dijon again arrived late: although scheduled to arrive at 5:00 a.m., Dijon arrived at 5:35 a.m. without calling ahead to report her delay or providing a doctor's note on arrival. Upon her late arrival, Dijon told Kegler that she had the stomach flu. Kegler documented her tardiness on another discipline form and provided

the form to his boss, Richardson. Kegler does not recall whether he asked Dijon if she had a doctor's note.

Kegler and Richardson told Wilks that Dijon's employment would be terminated because of her two tardy arrivals. Wilks said they should give Dijon another chance, although she recognized that Dijon would not be entitled to one under the policy. But Kegler and Richardson emphasized that the employee policy required termination. Richardson—whom Kegler and Wilks agreed held the sole discretion to terminate someone based on tardiness—notified Dijon that she was terminated for violating the attendance policy. Dijon objected and explained to Richardson that she had been ill, but, when asked if she had been to the doctor or had reached out to anyone, she said no. Dijon refused to sign her termination paperwork.

Dijon reported her termination as wrongful to Holly Hill, Human Resources Generalist for COTA, later that day. During Hill's investigation into the termination, Kegler stated that a male, cisgender student bus operator in his class had also been tardy three times but was not terminated for those violations. Kegler explained that the student's first late arrival was excused by COTA because it involved an expired CDL, which "should have been handled before [the issue] got to [COTA.]" DE 22-1, Kegler Dep., Page ID 548. The student's other two late arrivals involved the student's daughter's allergic reaction and an illness. After both of these tardy arrivals, the student was told "to go home and think about whether or not he wanted his job over the weekend and that he needed to bring in documentation, a doctor's note, for his daughter on Monday," or else he would be terminated. *Id.* at Page ID 549-50. He brought the doctor's note that Monday and was not terminated.

Dijon filed a charge of discrimination with the Equal Employment Opportunity Commission and received a Right to Sue Letter in November 2020. She filed suit shortly

thereafter. On COTA's motion for summary judgment, the district court found that Dijon established a prima facie case of sex discrimination but could not show that COTA's proffered reason for terminating her was pretextual. Second, the district court concluded that Dijon's retaliation claim failed because Dijon did not show that she engaged in an activity protected by Title VII or that there was a causal connection between her conversation with Kegler and her termination. The district court therefore granted COTA's motion for summary judgment on both claims. Dijon timely appealed, challenging only the district court's decision as to her sex discrimination claim.

## II.

We review the district court's grant of summary judgment de novo. *Colvin v. Caruso*, 605 F.3d 282, 288 (6th Cir. 2010). Summary judgment is appropriate only when "no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)(2)). At this stage, "the district court must draw all reasonable inferences in favor of the nonmoving party." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Summary judgment is not proper where there is "sufficient evidence supporting a factual dispute such that a judge or jury is required to 'resolve the parties' differing versions of the truth at trial.'" *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## III.

Dijon's sex discrimination claim arises under Title VII, which prohibits an employer from terminating an individual based on his or her sex. 42 U.S.C. § 2000e-2(a)(1). In *Bostock v.*

*Clayton County*, 140 S. Ct. 1731 (2020), the Supreme Court held that Title VII also prohibits discrimination based on an individual's status as a transgender person. 140 S. Ct. at 1754. Because Dijon supports her claim with circumstantial evidence, the claim is analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

To survive summary judgment, the *McDonnell Douglas* framework requires that Dijon first establish a prima facie case of discrimination by showing that she: (1) is a member of a protected class; (2) is qualified for the job; (3) suffered an adverse employment decision; and (4) was treated differently than similarly situated employees outside Dijon's class. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012); *see Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 575 (6th Cir. 2023). If a prima facie case is established, the burden shifts to COTA to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *McDonnell Douglas*, 411 U.S. at 802). Once a nondiscriminatory reason is asserted, the burden returns to Dijon to show that COTA's proffered reason was pretextual. *See Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996). The dispute on appeal solely concerns whether Dijon can show that COTA's proffered reason was pretextual.

To show that an employer's stated justification was pretext for discrimination, a plaintiff "must produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it fired [the plaintiff]." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (citations omitted). In other words, the plaintiff must produce "enough evidence to . . . rebut, but not to disprove" the employee's stated reason. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 651 (6th Cir. 2015) (alteration in original) (quoting *Shazor v. Prof'l Transit*

*Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014)). A plaintiff can establish pretext by showing: (1) that the proffered reason has no basis in fact; (2) it did not actually motivate the employer's actions; or (3) it was insufficient to motivate the employer's actions. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020) (citing *Chen*, 580 F.3d at 400)).

Dijon first argues that there is no factual basis for her termination because similarly situated persons outside her class who were late were not terminated like Dijon. In her reply brief, however, she apparently concedes that this argument has little support, shifting to rely on the latter two tests. *See* CA6 R. 22, Reply Br., at 7 ("[T]he two tardies allegation mainly fails the pretext tests of 'not actually motivating the employer's challenged conduct,' and being 'insufficient to warrant the challenged conduct.'"). This concession was appropriate, as Dijon's argument of differential treatment still leaves intact the factual basis for her termination: that Dijon was admittedly late two separate days, that these instances of tardiness were documented, and that COTA acted to terminate her in accordance with its written attendance policy and its strict timeliness expectations. Dijon fails to establish that COTA's stated reason for termination has no basis in fact.

For the next two pretext tests, Dijon's argument is the same. She contends that COTA's focus on timeliness and her tardiness did not motivate—and was insufficient to motivate—Dijon's termination because COTA was not motivated to terminate other similarly-situated, non-protected comparators on those same grounds. Dijon argues that COTA enforced its attendance policy more strictly towards her because it desired to "rid [the company] of a transgender person." CA6 R. 18, Appellant Br., at 30. COTA maintains that it applied its attendance policy consistently. It further argues that Dijon's offered comparators are insufficient to show pretext because they received different discipline based on different contextual circumstances.

"Where an employer argues that the plaintiff's differential discipline was justified by material differences in context, we evaluate whether that justification is pretextual by looking to the same or similar factors as when evaluating the 'similarly situated' element of the prima facie case." *Jackson v. VHS Detroit Receiving Hosp., Inc*., 814 F.3d 769, 779 (6th Cir. 2016) (citations omitted). But when we consider this analysis at the pretext stage, "the factual inquiry proceeds to a new level of specificity." *Id.* at 780 (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981)). In other words, we can review whether the actions of Dijon's comparators violated the same company rule or policy, the different circumstances involved in the separate actions, or whether the employees suffered a different type or severity of their actual or potential consequences. *Id.* (citations omitted); *see Chattman*, 686 F.3d at 350 (6th Cir. 2012) (comparing the "severity" and "commonality" of the employees' conduct); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 612 (6th Cir. 2002) (holding differential discipline could not create inference of discrimination where, although several employees violated the same rule, only plaintiff's violation led to the injury of coworker).

Dijon references three individuals whom she claims COTA treated differently under its attendance policy. Charlia Anderson was a female student bus operator trainee in Dijon's class, also under Wilks's instruction. Wilks testified that Anderson called COTA thirty minutes before her starting time to report that she would be tardy. Wilks documented Anderson's tardiness and notified Richardson of her delay, and Anderson was not terminated**.**

The second comparator offered by Dijon is the male, cisgender student bus operator in Dijon's class who was tardy three times but was not terminated for those violations. According to Kegler, the student's first late arrival was excused by COTA because it involved an expired CDL, and his next two late arrivals involved his daughter's allergic reaction and an illness. The student

told Kegler that he had a doctor's note for his daughter and Kegler allowed him to bring it the next workday, a Monday, or else he would be terminated. The student brought the doctor's note on Monday and was not terminated.

Finally, the last offered comparator[1] is an individual who notified COTA on her way to work that she had a flat tire on the freeway. However, Dijon does not provide any additional information regarding that student because she was not Wilks's student and thus Wilks could not confirm whether this person received a write-up.

All of these proffered comparators fail to support pretext. The first and third comparators fail because they both involved different conduct than Dijon: both employees were only late once and both notified COTA before their delayed arrival, unlike Dijon who was late twice without any prior notification. The second comparator is a closer call, but again can be distinguished from Dijon based on conduct. We start with the similarities of Dijon and this comparator. Both student bus operators violated the attendance policy without having previously notified COTA of the issue. As they were in the same class, presumably the male student and Dijon received the same attendance policy materials and explanation from Kegler. The record reveals that Dijon and this male student also received the same initial treatment after their respective late arrivals: they were both called into a meeting regarding their termination for violating the attendance policy.

The students' subsequent conduct distinguishes their situations. In her termination meeting, Dijon did not proactively offer that she could produce a doctor's note and, when asked by Richardson if she had been to the doctor, she admitted that she had not. By contrast, the male

---

[1] Dijon also claims that other unidentified student bus operators called in sick and were not terminated but provides no further identifying information. Even if the court had enough information to consider these offered comparators, the comparison would fail—these students apparently reported their sickness in advance, whereas Dijon provided no notice of her tardy arrivals.

student proactively stated that he could bring in a doctor's note after being told that he would be terminated. This variance in conduct is sufficient to result in a variance in consequence.

Even if Dijon were to establish pretext, COTA would still be entitled to summary judgment based on the "honest belief" doctrine. "If the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual even if it was erroneous." *Upshaw v. Ford Motor Co*., 576 F.3d 576, 586 (6th Cir. 2009). "The key inquiry in assessing whether an employer holds such an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action." *Sybrandt v. Home Depot, U.S.A., Inc*., 560 F.3d 553, 559 (6th Cir. 2009) (quoting *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007)). The "honest belief" doctrine generally precludes differing interpretations of company policy from creating genuine issues of material fact. *Id.* at 558-59.

The record indicates that COTA honestly believed that Dijon's tardiness on two separate occasions without any documented excuse warranted termination. The attendance policy makes clear that a late arrival could result in termination and that employees were to report absence or tardiness to their supervisors one hour prior to their scheduled arrival time. Multiple staff members at COTA confirmed the consistent application of the policy but also that a documented medical note could excuse a late arrival. Further, Kegler testified that he shared this fact with the class when reviewing the attendance policy. Dijon does not refute that this fact was shared, although she does not remember hearing it. According to the record, these factors readily informed COTA's interactions with Dijon.

COTA also made a considered decision before terminating Dijon. Each time that Dijon was tardy, Kegler asked her for the reason for her tardiness and included in his documentation the explanation provided for by Dijon. Richardson then made the termination decision based on her two tardy arrivals, met with Dijon, and asked her if she had been to the doctor for her asserted illness. Dijon did not offer that she had seen a doctor or had a doctor's note, so he terminated her. On this record, we cannot reasonably find that COTA's decision was ill-informed or ill-considered.

Dijon challenges this conclusion, relying on *Bloomfield v. Whirlpool Corp.*, 984 F. Supp. 2d 771, 780 (N.D. Ohio 2013) to argue that the "honest belief" rule does not apply. In *Bloomfield*, the district court recognized that the "honest belief" rule applies in the Sixth Circuit but concluded that it did not apply in that case because the defendant did not establish that its reliance on incomplete facts was reasonable. 984 F. Supp. 2d at 780-81. However, Dijon does not supply any explanation for why *Bloomfield*, a district court decision, would command a different outcome than the one we have reached here, particularly as she does not argue that COTA relied on any incomplete facts in making its decision to terminate her.

Dijon does not meet her burden to establish that COTA's legitimate, non-discriminatory reason for her termination was pretext for unlawful discrimination. Thus, the district court did not err by granting summary judgment in COTA's favor on Dijon's sex discrimination claim.

IV.

For the foregoing reasons, we affirm.