[Cite as *Zacharias v. State*, 2024-Ohio-5925.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Jerry Zacharias, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 23AP-495 |
| v. | : | (Ct. of Cl. No. 2021-00141JD) |
| State of Ohio, Office of the Ohio Attorney General, | : | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on December 19, 2024

**On brief:** *Marshall, Forman, & Schlein, L.L.C., Madeline J. Rettig, John S. Marshall*, and *Louis A. Jacobs* (of counsel) for appellant. **Argued:** *Madeline J. Rettig.*

**On brief:** *Littler Mendelson, P.C., Thomas M.L. Metzger* and *Judson S. Millhon*, Special Counsel for appellee. **Argued:** *Thomas M.L. Metzger.*

APPEAL from the Court of Claims of Ohio

BEATTY BLUNT, J.

{¶ 1} Plaintiff-appellant, Jerry Zacharias, appeals the decision of the Court of Claims of Ohio granting the defendant-appellee, Office of the Ohio Attorney General's, motion for summary judgment in this age discrimination in employment case.

{¶ 2} For 12 years and until May 2020, Zacharias was employed as a Law Enforcement Training Officer ("LETO") in the firearms training division at the Ohio Peace Officer Training Academy ("OPOTA"), a division of the Office of the Ohio Attorney General. His primary job responsibilities were to design, develop, and instruct courses regarding the use and safety of various firearms to law enforcement professionals. It is undisputed that Zacharias has knowledge about firearm use and safety and has received extensive firearm

education, training, and certifications. He served as a police officer for 16 years, as a firearms instructor at Marion Technical College for 8 years and has completed over 135 trainings and certifications in law enforcement firearms instruction throughout his career. (*See* Resume, Ex. 1 to Dep. of Jerry Zacharias.)

{¶ 3} In May 2020, the Attorney General decided to reorganize and reform OPOTA, and as part of that process, laid off all the employed LETOs (including Zacharias) and abolished those positions. OPOTA then created five new positions to replace the LETOs: two "Advanced Training Instructor (Firearms)" positions; two "Advanced Training Coordinator" positions; and one "Advanced Training (Driving)" position. (Aff. of Dwight Holcomb at ¶ 6.) The goal of this reorganization was for the persons selected for the new positions to "enhance the quality" of training and instruction, *id*. at ¶ 4, and to develop curriculum that was timely, current, and acceptable to a national standard of practice. It is not alleged that this reorganization or the layoffs were or associated with discrimination, and all the former LETOS—including Zacharias—were encouraged to apply for these new positions.

{¶ 4} Zacharias applied for both the firearms instructor and training coordinator positions but declined to apply for the driving instructor position. It is undisputed that Zacharias met the requirements for the two firearms instructor positions and the two training coordinator positions—in fact, it is undisputed that he was certified to teach more firearms classes than any of the other candidates. But he was not hired for any of the positions, and asserts he was discriminated against due to his age. Zacharias was 63 at the time, and the successful candidates for all four positions were younger than Zacharias—the 6 candidates who received offers[1] were all between 36 and 42 years of age.

{¶ 5} The ultimate decisionmaker as to who was hired for these positions was Daniel Ozbolt, who at that time was the Director of Advanced Training at OPOTA. (Feb. 17, 2023 Dep. of Daniel Ozbolt at 13.) Two other OPOTA employees were also on the committee—Richard Hardy, who was then OPOTA's Director of Professional Standards and Education Policy, (Nov. 28, 2022 Dep. of Richard Hardy at 11, and Louis Agosta, OPOTA's Accreditation Manager.) (Nov. 22, 2022 Dep. of Louis Agosta at 12.) Agosta had

---

[1] Two candidates declined to accept tendered offers for firearms instructor positions. (Aff. of Holcomb at ¶ 16-17.)

also been Zacharias' direct supervisor for over ten years, *id.* at 21, Ozbolt had worked alongside him as a LETO for several years prior to being promoted, took a few classes that Zacharias instructed, and had completed a positive instructor evaluation of Zacharias in the past. (*See* Ozbolt Dep. at 14-38 and Ex. 60 to Ozbolt Dep. (stating that this was Ozbolt's "second instructor course with Jerry [and there were] obvious improvements from a year ago").) Hardy had taken a firearms class from Zacharias several years earlier. (Hardy Dep. at 15-18.)

{¶ 6} As part of the interview process, each of the three members of the committee completed a "rater sheet" for each candidate, which scored the interviewees on professionalism, communication, attentiveness, customer service/interpersonal skills, computer experience, education/training, experience related to the position, knowledge of the position, and work history/dependability. (*See* Rater Sheets, Ex. 5 to Zacharias Dep.) Based on the combined scores in each category, the interviewees were each given an overall score out of ten. Zacharias received consistently high scores for his education, experience, knowledge, and work history, but lower scores for his professionalism, communication, attentiveness, interpersonal skills, and computer experience. He received an average score of 7.5 from Ozbolt, 7.3 from Agosta, and 7.77 from Hardy, for a calculated average score of 7.52. (Holcomb Aff. at ¶ 14.) All the employment offers extended were to candidates who received higher calculated average scores on the rater sheets, and the positions were ultimately filled by candidates whose scores were 9.75, 9.29, 8.55, and 7.77, respectively. *Id.* at ¶ 16-20.

{¶ 7} During the period between the announcement of OPOTA's reorganization and the decision not to hire him for any of the four new positions, Zacharias had approximately five separate conversations with the hiring committee members, two with Ozbolt and three with Agosta, each of which included some remarks touching on his eligibility for retirement, which he had indicated might eventually be in Florida. (*See generally* Mar. 13, 2023 Zacharias Dep. at 101-13.) It is undisputed that these comments were not made during the interview process—at least one of his conversations with Agosta occurred after Zacharias was notified that the OPOTA was being reorganized, *see id.* at 112-13, and another was a mutual discussion with Agosta about each man's years of service prior to retirement. *Id.* at 104-06. Zacharias described his conversations with Agosta as follows:

Q. Did you ever tell anybody at OPOTA that you were interested in moving to Florida at any time?

A. I said my sister keeps asking me.

And I said, well, I'm working at OPOTA and I have no reason to leave.

But they certainly gave me one.

Q. During these conversations where Mr. Agosta had discussed retirement in general, did he say anything that you considered to be negative regarding your age?

A. I took it as a negative that perhaps I was ready for retirement because of how he valued my worth to the agency or the value of my work.

Q. Did you say you were ready for retirement?

A. No.

Q. Did he say you were ready for retirement?

A. He asked me, he said, well, you can retire and go to Florida.

I can do very many things.

Q. But did he say that you were ready for retirement?

A. He just said, you can retire right now and go to Florida and be with your sister.

Q. And when did he say that?

A. One of the several -- one of the three times that he would talk to me.

He says, well, heck, you can always go to Florida and retire to Florida and be with your sister.

Yeah, that's an option, but that's my option and not his.

Q. And what did you say to him in response to that?

A. I just said, I'm not ready to -- I said, you know, I'm hoping that -- at that point, I had not been told that I would not be tendered an offer to work. We had been told that we were not going -- we were all going to be fired. And I had every

confidence that I would be made an offer to -- would be tendered an offer to return on the instructional staff.

Q. And when you're saying Mr. Agosta said you can retire or could retire and go to Florida, that was an option, just not a choice you wanted to make at that point, right?

A. Yes. But it's not a subject -- broaching -- the point is, I didn't come to him to get advice about my future. He wants to address my future. He wants to say, well, if it doesn't work out, you've always got retirement. You can always retire to Florida.

Again, I didn't breach [sic] that subject with him and -- but he thought that that was something that he should bring up.

*Id.* at 107-09. Zacharias also described a similar conversation with Ozbolt:

Q. Ozbolt had mentioned or the topic of retirement came up; is that right?

A. Yes. I think he -- well, like I said, I think he brought it up one time when we were still -- when I was still there at the agency or in that time period. But then if I'm not mistaken, August of 2020 was the first time I fired a weapon after I had my surgery. I was released to do that. And I was qualifying with Madison County SO. And he was still on staff there. He came out and started talking and was talking about how he thought I would already be down in Florida or why I wouldn't be down in Florida, so . . .

Q. So Mr. Oswalt mentioned that --

A. Ozbolt.

Q. Mr. Ozbolt mentioned that after your employment with OPOTA had ended, correct?

A. Yes.

Q. Had Mr. Ozbolt ever mentioned that during your employment with OPOTA?

A. I think in the same time frame that waiting to see if we knew we were going to be leaving and waiting to see if I would be tendered an offer, I think he discussed it with me and said, I always hear you talking about your sister in Florida.

> And he asked me how many years I had in.
>
> Just like Lou. Lou said, well, how many years do you got in?
>
> I said, I've got 28 combined.
>
> Well, you can retire. Yeah, you can go to Florida and retire and be with your sister.
>
> And a similar conversation with Mr. Ozbolt.
>
> Q. So the conversation with Mr. Ozbolt regarding your potential for retirement was after you had been laid off, correct?
>
> A. Yes. One was before I was told I wouldn't be tendered an offer and one was after I was told I wouldn't be tendered an offer.

*Id.* at 110-11. Finally, Zacharias also described a conversation he had during this same period with Dwight Holcomb, the Executive Director of OPOTA, in which Holcomb stated words to the effect that "this is my third retirement job. And you know, retirement is nothing to be afraid of." *Id.* at 101-02.

{¶ 8} After he was not selected for one of the two open firearms instructor or two open training coordinator positions, Zacharias applied for a different open job as a "Curriculum Design Specialist," who was required to have "instructional experience as well as the knowledge and skills to research, manage, revise, develop, and deliver training related to the academies," and also "the ability to coordinate courses in other disciplines." (Hardy Dep. at 133; Ex. 34.) Rather than the three-member committee used for the firearms instructors and training coordinators, Hardy alone conducted interviews for this position. As part of the application, Zacharias completed a writing assignment and a spelling, punctuation, and grammar assessment, but he performed poorly on both. (*See* Ex. 7 and 8 to Zacharias Dep.) After the interviews, Hardy reposted the position, and ultimately recommended a different candidate who had been a longtime certification officer with a different state organization and had a "strong working knowledge of the position and interaction with all aspects of the [OPOTA]," and had performed very well on both assessments. (Hardy Dep. at 130-32; Ex. 37.) Zacharias ultimately admitted that had no "fact or reason" to believe that he was not hired for this position because of his age, and had

no basis to believe that the candidate who was hired was unqualified for the position. (Zacharias Dep. at 128-29.)

{¶ 9} Later in the year, one of the training coordinator positions reopened because one of the previously-hired candidates had resigned. Zacharias applied for the reopened position but based on advice from OPOTA's Human Resources department, he was not selected for an interview. (Holcomb Aff. at ¶ 27-30.) The position was filled by a candidate with a master's degree in forensic science and who had worked as a crime scene technician, because new demands at OPOTA required "somebody with crime scene experience" to instruct "evidence technicians and crime scene and death investigation classes." (Ozbolt Dep. at 141. (*See also* Rater Sheet, Ex. 31 to Ozbolt Dep. at 2 (noting that the hired candidate had "practical experience working for 8 yrs on crime scenes & several months on OPOTA instructor teaching that topic * * * [and] has a unique skill set needed here at OPOTA").) Zacharias admitted that he did not know whether the hired candidate was unqualified under the current regulations governing that position, but he believed that under the previous regulations governing LETOs "that he probably would not have qualified for what they intended him to do * * * [because he was an] evidence tech * * * [and] never a sworn officer."

{¶ 10} On March 17, 2021, Zacharias filed this lawsuit in the Court of Claims of Ohio, alleging that the decisions not to hire him for these positions violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621-34. (Compl. at ¶ 1.) Following preliminary discovery and the depositions of Daniel Ozbolt, Richard Hardy, Louis Agosta, and Zacharias himself, the Attorney General filed a motion for summary judgment, arguing that there was "no evidence to support Plaintiff's claim of age discrimination," and that OPOTA "made all of its hiring decisions based on the legitimate, nondiscriminatory reason of determining the most qualified candidate or candidates for each position." (Apr. 17, 2023 Def.'s Mot. for Summ. Jgmt. at 2.)

{¶ 11} The trial court subsequently issued a 40-page decision granting the Attorney General's motion for summary judgment, concluding that as to the three-member panel's decision not to recommend hiring Zacharias as a firearms instructor or training coordinator, "the record contains no evidence upon which this Court can infer that the hiring committee's assessment of Plaintiff's interview performance was untrustworthy or

pretextual," (Aug. 4, 2023 Decision at 33-34), that "Plaintiff did not present sufficient evidence for this Court to conclude that any scoring or hiring recommendation by the hiring committee members was made because of Plaintiff's age," *id.* at 36; that as to the Curriculum Design Specialist position "Plaintiff did not meet his burden to establish a prima facie case," but that in any event his "claim would ultimately fail because the evidence that Plaintiff advances to rebut Defendant's articulated reasons [for choosing to hire a different candidate] does not provide a basis upon which a reasonable factfinder" could find that decision was pretextual, *id.* at 38; and that as to the reopened training coordinator position, "Plaintiff provides no evidence that HR's decision to not extend Plaintiff an interview for this opening was because of his age or to otherwise support an inference of intentional discrimination." *Id.* at 39. The trial court therefore concluded that the evidence did not present a triable dispute of material fact and granted summary judgment in favor of the Attorney General. Zacharias now appeals, and asserts a single assignment of error with the trial court's judgment:

> The Court of Claims erred by failing to draw a reasonable inference of pretext camouflaging age-discriminatory bias from the facts, when viewed the light most favorable to Appellant, raised genuine issues of material fact where: (1) his relative qualifications and experience [were] better than or the same as the relative qualifications of the successful applicants, all of whom were significantly younger than Appellant, and (2) additional probative evidence of age discrimination existed from which a fact-finder could draw an inference of pretextual motives.

**{¶ 12}** Civ.R. 56(C) provides that "[s]ummary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Supreme Court of Ohio has explained that "[s]ummary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. The burden of showing that no genuine issue of material fact exists falls upon the party who files for summary judgment." *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-

3455, ¶ 10. In deciding motions for summary judgment, the trial court must give the nonmoving party "the benefit of all favorable inferences when evidence is reviewed for the existence of genuine issues of material facts." *Id.* at ¶ 25. Appellate review of a trial court's decision on summary judgment is de novo, and the appellate court applies the same standards as the trial court. *Bonacorsi v. Wheeling & Lake Erie Ry.*, 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24. As such, we may affirm the trial court's judgment if the record supports any of the grounds raised by the movant, even if the trial court failed to consider those grounds. *Bank of N.Y. v. Barclay*, 10th Dist. No. 03AP-844, 2004-Ohio-1217, ¶ 8, citing *Bard v. Soc. Natl. Bank*, 10th Dist. No. 97AP-1497, 1998 Ohio App. LEXIS 4187 (Sept. 10, 1998). Here, the overarching question for this court's consideration is whether the evidence, viewed most strongly against the Attorney General, can establish a disputed question of material fact as to whether Zacharias was intentionally discriminated against because he was over the age of 40.

{¶ 13} We begin our analysis by observing that "an employer is under no obligation to transfer to another position in the company an employee whose position has been eliminated, [but] the employer violates the ADEA when it transfers other displaced employees but does not place the plaintiff in a new position because of age discrimination." *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 623 (6th Cir.2006). Accordingly, Zacharias may assert a claim for failure-to-hire on these facts, and there is a three-part framework for analyzing these claims.

{¶ 14} First, there does not appear to be any dispute that Zacharias has established a prima facie case, at least insofar as it relates to the firearms instructor and training coordinator positions[2]—he is a member of the protected class, he was qualified for the positions, he was not hired, and "significantly younger" candidates were hired instead. *See, e.g., Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir.2003), citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and *id.* at 335 (observing that the fourth

---

[2] In its memorandum for summary judgment, the Attorney General argued that Zacharias could not establish a prima facie case regarding the Curriculum Design Specialist position. (Apr. 17, 2023 Mot. for Summ. Jgmt. at 19-21; May 15, 2023 Reply Memo at 3.) The trial court agreed and held that he had failed to establish a prima facie case as to that position (Aug. 4, 2023 Decision at 38), but also observed that even if it assumed that Zacharias had established a prima facie case, that the evidence demonstrated that he had failed "to meet his burden to show that [OPOTA]'s nondiscriminatory reasons [for hiring a different candidate] either had not basis in fact, did not actually motivate its failure to hire [Zacharias], or that the reason was insufficient to motivate selecting [the successful candidate]." *Id.* at 39.

element of the *McDonnell Douglas* test has been modified to require replacement not by a person outside the protected class, but merely by a significantly younger person). Therefore, the burden next shifts to the Attorney General to " 'articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " *Id.*, quoting *Kline v. TVA*, 128 F.3d 337, 342 (6th Cir.1997) and *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Here, the Attorney General contends that Zacharias was simply not the best candidate of those interviewed for the new positions as they were to be constituted, and there is undoubtedly some evidence to support this claim. Presuming that the Attorney General's evidence is sufficient to satisfy the "legitimate, nondiscriminatory reason" standard, then Zacharias "must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir.2008) (citing *McDonnell Douglas*).

> At this stage, the plaintiff has the burden to produce "sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). She can accomplish this by proving " '(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [her discharge], or (3) that they were *insufficient* to motivate discharge.' " *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (emphasis in original) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). The three-part test need not be applied rigidly. Rather, "[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Chen*, 580 F.3d at 400 n.4.

(Emphasis sic.) *Blizzard v. Marion Technical College*, 698 F.3d 275, 285 (6th Cir.2012). Finally, in a failure-to-hire claim the Sixth Circuit has permitted plaintiffs to demonstrate pretext by comparative "qualifications evidence":

> Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination. *In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment * * *. On the other hand, in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the*

> *rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former.* In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual * * *. [W]e reject here - as we must, given *Burdine* - a rigid rule that qualifications evidence is never probative of pretext. Yet, when qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext, the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation.

(Emphasis added.) (Internal citations and quotations omitted.) *Bender*, 455 F.3d at 626-27.

{¶ 15} In sum, we believe this case can be boiled down to two questions—first, whether Zacharias' qualifications were so much better than the hired applicants that no reasonable employer would have chosen them over him; or second, whether, when taken together with the retirement discussions, that the discrepancy between his qualifications and those of the successful applicants was sufficient to demonstrate that the Attorney General's alleged innocent motives were pretextual.

{¶ 16} If the only qualifications for any of the positions were firearm expertise and firearm instructor certifications, we could easily answer the first of these two questions in Zacharias' favor. It is beyond dispute in the evidence that Zacharias had more firearms expertise and certifications than any of the other applicants—indeed, the Attorney General's witnesses admitted as much. But the record establishes that all of the positions— "Advanced Training Instructor (Firearms)," "Advanced Training Coordinator," and "Curriculum Design Specialist"—require more. Thus, we cannot conclude that Zacharias' qualifications were "so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former," as required where there is no other evidence of pretext. *Bender*, 455 F.3d at 627.

{¶ 17} Moreover, we cannot conclude that the decision not to hire Zacharias for the Curriculum Design Specialist position was a result of age discrimination. It is undisputed that Zacharias performed poorly on the writing and spelling, punctuation, and grammar assessments he took in connection with his application, and that he did not perform well in

his interview. (*See* Zacharias Dep. at 126; Interview Questions and Notes; Ex. 34 to Hardy Dep. at 2 (giving an overall interview score of 22 of 60).) Zacharias himself admitted that there was not "any fact or reason to believe" that he was not given the Curriculum Design Specialist position because of his age (Zacharias Dep. at 128), that he had no knowledge that the scores Rick Hardy assigned for him for his interview answers were based on his age, *id.* at 125, and that he had no reason to believe the candidate who was ultimately hired for the position—who was almost 58 at the time she was hired (*see* Holcomb Aff. at ¶ 26)—was unqualified. (Zacharias Dep. at 129.) Aside from a nebulous and factually unsupported theory that Hardy's interview scoring for the position was somehow tainted by his earlier discussions with Agosta and Ozbolt, there is no basis for any reasonable factfinder to conclude that Zacharias was the better qualified applicant for the position. There is simply no evidence of pretext relating to the Curriculum Design Specialist position—instead, the evidence strongly suggests that Zacharias was not a particularly qualified candidate for that job.

{¶ 18} But as to the Advanced Firearms Training Instructor and Advanced Training Coordinator positions, there is some evidence in the record that suggests an age bias. Zacharias points specifically to "the sudden change of opinion by Mr. Ozbolt and Mr. Agosta as to Mr. Zacharias' performance and instructor abilities during the time of the interview as compared to his favorable performance reviews (authored by Mr. Agosta) and his positive student evaluation (filled out by Mr. Ozbolt in May 2019 as a student in Appellant's class)," in addition to the multiple references by Ozbolt and Agosta to Zacharias' retirement.

{¶ 19} In its examination of the record, the trial court wholly failed to address a fact that we believe is significant—as noted above, Agosta was Zacharias' direct supervisor for approximately ten years, and consistently gave Zacharias performance reviews stating that Zacharias met or exceeded the expectations for his role as a LETO during that entire period. (*See* Performance Reviews and Employee Evaluations, Exs 5 through 15 to Agosta Dep. and Agosta Dep. at 52-93 (acknowledging reviews and describing Zacharias as a "good employee").) But on his interview rater sheet for the positions, Agosta simply described Zacharias as "adequate" and focused largely on his apparent "problems transferring information to the student." (*See* Agosta Rater Sheet at 2, Ex. 5 to Zacharias Dep.) Moreover, Agosta admitted that Zacharias interviewed for the positions "fairly well,"

(Agosta Dep. at 106), but that the reason he wasn't selected was that "he didn't score the highest on our rater sheets." *Id.* at 108. Similarly, in his student course evaluation of Zacharias from the 2019 course, Ozbolt described the quality of Zacharias' instruction as "superior," but on his rater sheet described Zacharias as difficult to follow. (*Compare* Ozbolt Rater Sheet at 1, Ex. 5 to Zacharias Dep., with Course Evaluation, Ex. 55 to Ozbolt Dep.)

{¶ 20} While Agosta and Ozbolt seemingly both had issues with Zacharias' communication skills, we believe the unusual change in their opinions about Zacharias' abilities is evidence upon which a reasonable factfinder could rely to determine that the employer's explanation of why he was evaluated lower during the interviews than he had been as an employee and instructor might well be pretextual. We must admit that this evidence standing alone is not strong, and we do not and cannot suggest that it is so persuasive that a reasonable factfinder would be required to reach a verdict in favor of Zacharias. But when combined with the several times that Ozbolt and Agosta raised the topic of retirement plans to Zacharias and when viewed most strongly against the Attorney General, this evidence creates a genuine dispute of material fact over the reason Zacharias was not hired for either of the positions, and a reasonable factfinder could conclude that Zacharias was passed over because of his age.

{¶ 21} For the foregoing reasons, we conclude that the trial court erred in granting summary judgment to the Attorney General as to Zacharias' applications for the Advanced Firearms Training Instructor and Advanced Training Coordinator positions. Accordingly, we sustain Zacharias' assignment of error in part, reverse the judgment in part, and remand this case to the Court of Claims of Ohio for further proceedings consistent with this decision.

*Judgment reversed in part;*
*and case remanded.*

MENTEL, P.J., and EDELSTEIN, J., concur.

———————